UNITED STATES of America, Appellee,

v.

Angelo PACCIONE, Anthony Y. Vulpis, John J. McDonald, A & A Land Development, Stage Carting, Inc., August Recycling, Inc., New York Environmental Contractors, Inc., National Carting, Inc., Rosedale Carting, Inc. and Vulpis Brothers, Ltd., Defendants–Appellants.

Nos. 1569–1576 and 1603, Dockets 90–1587 to 90–1593, 90–1597 and 90–1629.

United States Court of Appeals, Second Circuit.

Argued June 17, 1991.

Decided Nov. 15, 1991.

1184

---

Elliot R. Peters, Asst. U.S. Atty., New York City (Roger S. Hayes, Acting U.S. Atty. S.D. N.Y., Jeffrey B. Sklaroff, Deirdre M. Daly, David E. Brodsky, Daniel C. Richman, Asst. U.S. Attys., New York City, on the brief), for appellee.

Nathan Z. Dershowitz, New York City (Victoria B. Eiger, Dershowitz & Eiger, New York City, Alan M. Dershowitz, Amy Adelson, Cambridge, Mass., on the brief), for defendants-appellants Angelo Paccione, A & A Land Development, August Recycling, Inc., National Carting, Inc., and Stage Carting, Inc.

Barbara L. Hartung, New York City (Alan P. Williamson, Morvillo, Abramowitz & Grand, New York City, on the brief), for defendant-appellant Anthony Vulpis.

Robert Kasanof, New York City (Edward M. Chikofsky, New York City, on the brief), for defendant-appellant John McDonald.

Karen Silverman, New York City (James M. LaRossa, Michael S. Ross, LaRossa, Mitchell & Ross, New York City, on the brief), for defendants-appellants Rosedale Carting, Inc. and Vulpis Bros., Ltd.

Before MESKILL, KEARSE, and McLAUGHLIN, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Angelo Paccione, Anthony Y. Vulpis, and John J. McDonald (collectively the "individual defendants"), and defendants A & A Land Development, Stage Carting, Inc., August Recycling, Inc., National Carting, Inc., Rosedale Carting, Inc., and Vulpis Brothers, Ltd. (collectively the "corporate defendants"), appeal from judgments entered in the United States District Court for the Southern District of New York convicting them, following a jury trial before Constance Baker Motley, *Judge,* of racketeering and mail fraud offenses in connection with waste dumping operations. Paccione, Vulpis, and the corporate defendants were convicted of participating and conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d) (1988) (counts 1 and 2), and five counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2 (1988) (counts 5–9). Paccione was also convicted on an additional mail fraud count (count 12). McDonald was convicted on one count of mail fraud (count 12). Paccione and Vulpis were sentenced principally to 151 months' imprisonment, to be followed by three-year terms of supervised release; McDonald was sentenced principally to 12 months' imprisonment and ordered to pay a $79,500 fine. In lieu of forfeiture, fines, and restitution, the corporate defendants, Paccione, and Vulpis entered into a court-approved agreement to pay the government $22 million.

On appeal, defendants contend principally (1) that they were deprived of due process by the use of an anonymous jury, (2) that the conduct charged to them was not within the purview of the mail fraud statute, and (3) that the trial court made various evidentiary errors. Paccione and Vulpis also contend that the district court erred in computing their sentences under the federal Sentencing Guidelines ("Guidelines"). For the reasons below, we affirm the judgments of conviction.

## I. BACKGROUND

In 1988, much of the private carting business in the New York City boroughs of Brooklyn and Queens was controlled by Paccione and Vulpis. Paccione was the president and majority shareholder of defendants August Recycling, Inc., National Carting, Inc. ("National"), and Stage Carting, Inc. ("Stage") (collectively the "Paccione companies"); Vulpis owned 50% of defendants Rosedale Carting, Inc. ("Rosedale"), and Vulpis Brothers, Ltd. (collectively the "Vulpis companies"). Together, these entities generated income of some $23,000,000 per year. The present prosecution arose principally out of defendants' fraudulent operation in 1988 of an environmentally hazardous landfill on 110 acres of largely undeveloped land on Staten Island, New York. Victims of this fraud included the City of New York ("City") and CSX Realty Corporation ("CSX"). Defendants operated by, *inter alia,* disregarding regulations promulgated by the City's Department of Consumer Affairs and the New York State ("State") Department of Environmental Conservation ("SDEC") and fraudulently obtaining dumping permits from the City's Department of Sanitation ("CDOS") and the City's Department of Transportation ("CDOT"). In addition, certain defendants engaged in a fraudulent scheme with respect to the disposal of infectious medical waste. The evidence presented at the 12–week trial, taken in the light most favorable to the government, revealed the following.

### A. *The Illegal Dumping Scheme*

Waste disposal in New York City is subject to stringent regulations adopted primarily in recognition of health and environmental dangers. "Clean waste" or "clean fill," which generally includes clean earth and/or ashes, dirt, concrete, rock, gravel, stone, slag, and sand, is often used to upgrade building sites, and upon obtaining the proper permits, a contractor may dump specified quantities of clean fill on any identified location. For other types of waste, however, the regulations are more

restrictive. Private carters seeking to dispose of waste other than clean waste within the City must use a City-owned landfill. The principal City landfill is the Fresh Kills Sanitary Landfill ("Fresh Kills") on Staten Island. Under regulations promulgated by the City and SDEC, carters must pay the City a dumping fee for use of Fresh Kills. From March to October 1988, this fee was $18.50 per cubic yard of putrescible trash and construction or demolition debris; the fee for asbestos, which was classified as hazardous waste and required greater disposal precautions, was significantly higher.

Arlington Yard, a 110–acre former railroad yard located several miles from Fresh Kills, contains the largest undeveloped parcel of real property on Staten Island. Though it still contained some remnants of former rail operations and some small piles of refuse, until mid–1988 Arlington Yard was overgrown with vegetation and trees, attracted wildlife, and was considered suitable for residential development.

In 1988, some 72 acres of Arlington Yard were owned by CSX, an entity headquartered in Virginia. CSX had previously sold two peripheral segments of the Yard to one Kenneth I. Wilpon; the Wilpon parcels were managed by W & W Properties ("W & W"), a partnership formed by Wilpon and Fred E. Weiss, a Staten Island real estate developer. (As discussed in greater detail in Part II.A. below, Weiss, originally named as a defendant in this action, was murdered prior to trial.) In 1988, W & W proposed to CSX that clean fill be placed on their adjoining properties to prepare the land for development. CSX considered the proposal but never gave permission to Wilpon, W & W, or defendants to place any waste, clean or otherwise, on its property.

In the spring of 1988, Paccione and Vulpis formed defendant A & A Land Development ("A & A") and obtained permits from CDOT, CDOS, and SDEC, for the operation by A & A of a clean fill operation on the W & W land. Defendants never had authorization from CSX to use its part of Arlington Yard, and they never sought authorization to dump anything other than clean fill on the W & W portion of the Yard. None-theless, from May until mid-September 1988, A & A proceeded to operate a full-scale commercial dump at Arlington Yard, on both W & W and CSX land. Trucks filled with putrescible garbage, construction and demolition debris, medical waste, and asbestos dumped their loads into recently excavated pits. When the pits were filled, more waste material was heaped on, creating a plateau some 20 to 30 feet high. The heap was then covered with a thin layer of the "clean" dirt that had been excavated to create the pits, so that the dump appeared to consist entirely of clean fill.

During the A & A dump's first two months of operations, CSX continued to consider W & W's proposal to put clean fill on CSX property, mistakenly believing that dumping was proceeding only on the W & W land. In June, Paccione mailed CSX a letter falsely reassuring it of the quality of the A & A operation. For example, the letter stated that daily inspections and testing were being conducted; in fact there were no such inspections. Paccione also stated that "[a]ll material delivered to the site comes from various excavation and construction sites"; instead much of the material brought to the site was garbage, medical waste, and asbestos.

CSX executives visited Arlington Yard in late July and only then became aware that a dumping operation was underway on CSX's land. They immediately instructed Paccione, Vulpis, and Weiss in person to cease all dumping on CSX property; CSX gave the same instructions to Wilpon and Weiss by telephone and in writing. In a visit in early August, CSX executives again toured the property; they saw garbage in a pit and smelled foul odors. They repeatedly wrote to Paccione, Vulpis, Wilpon, and Weiss, stating that the dumping on CSX's property was unauthorized. In mid-August, having failed to get defendants to stop using its property, CSX obtained a temporary restraining order barring A & A from CSX's land. Defendants ignored the restraining order and continued to pile garbage onto its land.

On August 25, 1988, after CDOS investigators had found garbage in one of the pits at the A & A dump, Paccione made numerous misrepresentations to CDOS officials. He falsely stated that all of the dump's employees had strict orders to turn away trucks carrying anything other than clean fill. In fact, his own company's trucks and trucks of the Vulpis companies were daily being allowed to dump their putrescible loads, mixed with hospital waste and asbestos. Paccione stated that a corrupt employee had been responsible for permitting the dumping of the unacceptable material seen by the CDOS inspectors and represented that the employee had been fired as a result of the incident. In fact, the employee he named was never fired but continued to work at the dump until the State eventually closed it down. Paccione also assured the inspectors that the materials A & A accepted were clean and did not contain any demolition materials, "building fill," or rags, representing that 50–100 test samples a week were being taken from incoming loads and analyzed by a laboratory. In fact, no such testing procedure had ever been implemented.

On September 14, 1988, SDEC shut down the A & A landfill operation. The ensuing investigation by City, State, and federal officials revealed asbestos, rotting materials, construction debris, household garbage, and medical waste across the entire Arlington Yard. In all, prior to the shutdown, at least 550,000 cubic yards of refuse had been unlawfully dumped by defendants at the Yard. Much of the garbage deposited at the illegal operation was dumped by the Paccione and Vulpis companies. By dumping at Arlington Yard, these companies avoided paying the approximately $800 per truckload dumping fees that would have been required at Fresh Kills, totaling some $4,625,000. In addition, A & A charged other companies $10 per cubic yard to dump their refuse at the site, considerably less than the $18.50 generally charged by the City at Fresh Kills. In its four months of operation, A & A's dump had revenues of approximately $2.6 million. From these revenues, Paccione received $315,610 in direct weekly payments; Vulpis received $286,728 in direct weekly payments; and McDonald cashed checks totalling $196,565.

As a result of the A & A operation, the City lost the business of the Paccione and Vulpis companies, as well as business from other companies that defendants allowed to dump at the illegal Arlington Yard site. Accordingly, the City experienced a sharp decline in the tonnage of construction waste deposited at Fresh Kills during this period and a concomitant decline in revenue. In addition, CSX's property, which prior to defendants' unlawful dumping had had an estimated value of $20 million based on its potential for residential development, became unusable for that purpose without a clean-up operation costing approximately $15 million. As of the time of trial, the entire extent of the environmental harm done to that property had not yet been ascertained.

B. *The Infectious Medical Waste Scheme*

In addition to the A & A illegal landfill, Paccione and Vulpis, along with McDonald, engaged in an unlawful scheme with respect to the disposal of infectious or "red-bag" medical waste. Throughout the period covered by the indictment, the State had stringent regulations with respect to the disposal of such waste. Haulers of red-bag waste were required, *inter alia*, to be specially licensed by SDEC, to transport the waste in properly licensed and marked vehicles, and to store the waste only in specified locations and only for a limited time. Transfer of permits between companies was not allowed. Beginning in August 1988, SDEC required an applicant for permits to include background information on its individual owners in order to permit SDEC to determine whether those who owned and operated the company had previously committed environmental offenses. In November 1988, the penalties for improper transportation, storage, and disposal of infectious medical waste were increased significantly. Unlike prior statutes, the new red-bag law subjected doctors and medical facilities to potential strict liability if their red-bag waste were mis-

handled in any way, including civil penalties of up to $50,000 per day and criminal sanctions that included prison terms.

In 1988, Paccione, Vulpis, and McDonald formed defendant New York Environmental Contractors, Inc. ("Environmental Contractors"), for the commercial collection of red-bag and other medical waste. Environmental Contractors began publicizing the new penalties and advertising itself as a properly licensed infectious waste transporter upon which doctors and hospitals could rely to avoid mishandling and liability. It ran full-page advertisements in *The New York Doctor*, a health-related publication, and mailed copies to as many as 1,000 doctors and hospitals. One such advertisement read, in pertinent part, as follows:

---

**IS YOUR MEDICAL WASTE**
**BEING WASHED UP ON**
**A BEACH?**

**YOU COULD BE PROSECUTED !**

**Let Us Handle Your Waste Problems:**

**New York State Licensed . . . .**

**. . . .**

**BE SAFE, BE SURE, USE**

**NEW YORK**
**ENVIRONMENTAL CONTRACTORS, INC.**

**. . . .**

---

(Emphasis in original.) Vulpis and McDonald also mailed leaflets to prospective clients explaining the new civil and criminal penalties for improper disposal of infectious waste and describing how Environmental Contractors would comply with all of the rules and regulations governing the disposal of such waste. The leaflets maintained, *inter alia*, that

> N.Y. Environmental Contractor's Corporation is fully insured and licensed to handle the collection, transportation and disposal of ... infectious material.... Our organization was established with the moral and ethical convictions to [*sic*] proper handling of infectious waste removal and that it is to be managed is [*sic*] a safe and non-hazardous manner. These convictions lead us in our decisions to maintain rigid and concise measures in the removal and disposal of infectious waste material. Our company has trained personnel who are health orientated [*sic*] and environment conscious. We are deeply committed to obtaining a non-hazardous-environment, where infectious waste removal and disposal is involved.

Contrary to its representations, Environmental Contractors was neither properly licensed, nor ethical, nor competent. All of its permits were either bogus or obtained by forgery and fraud. It fabricated its first SDEC infectious waste transporter "permit" by pasting the name "New York Environmental Contractors" onto a permit previously issued to August Recycling, Inc. Environmental Contractors then mailed copies of this document to several doctors who had asked to see its permit before

hiring the company. When Environmental Contractors submitted an application to obtain its own first SDEC transporter permit, McDonald forged the signature of a Pennsylvania incinerator manager supposedly certifying that the incinerator had agreed to accept Environmental Contractors's infectious waste for disposal. In October 1988, when Environmental Contractors was applying to SDEC for an amended permit, though McDonald, Paccione, and Vulpis had represented to banks and other regulatory bodies that they each owned one-third of Environmental Contractors, McDonald represented in the application that he was the sole owner of the company, presumably to conceal the financial interests of Paccione and Vulpis who were then under investigation for their roles in the A & A dump.

Environmental Contractors's operations were no better than its acquisition of permits. For example, on September 16, 1988, SDEC officer James Milewski saw a Vulpis company truck parked outside of National in a commercial and residential area. Though the truck was not authorized on any SDEC permit to transport infectious medical waste, it contained improperly unmarked barrels of infectious waste and 245 boxes of such waste. This waste, which Environmental Contractors had collected from its customers and had transferred to the truck, included blood vials and human organs. The truck did not have the required warnings posted on its exterior to indicate that it contained infectious waste; it had been parked in front of National for some two weeks, though the regulations permitted storage for no more than five days; and because of its failure to properly contain the waste, it was leaking blood onto the pavement.

Environmental Contractors's last SDEC permit expired on March 31, 1989, but the company continued to collect and dispose of infectious waste without a permit. From February until June 1989, Environmental Contractors operated out of a transfer station belonging to All County Sanitation, a company owned by Vulpis in Long Island City, New York, where infectious waste was stored for as long as two months.

This facility was not authorized by SDEC to serve as an infectious waste storage facility.

Each of Environmental Contractors's violations of the state regulatory scheme in September 1988 and during the early months of 1989 exposed to legal sanctions the persons who had generated the waste found in Environmental Contractors's possession. Several of these persons or entities were required to pay civil penalties.

## C. The Verdicts and the Sentences

Based on the A & A dumping operation and the Environmental Contractors medical waste collection operation, a 12–count superseding indictment charged all defendants with a substantive RICO violation, to wit, conducting and participating in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) (count 1); and with RICO conspiracy, in violation of 18 U.S.C. § 1962(d) (count 2). It charged all defendants except McDonald and Environmental Contractors with five counts of scheming to defraud the City of dumping revenues and license fees in connection with the A & A dump site, in violation of the mail fraud statute, 18 U.S.C. § 1341 (counts 3–7), and with two counts of scheming to defraud CSX of the value of its Arlington Yard property through the A & A dumping operations, also in violation of § 1341 (counts 8 and 9). Counts 10 and 11 charged Paccione and Vulpis, along with their "co-racketeers" and certain of their respective companies, with schemes to defraud certain hospitals in connection with the disposal of infectious or medical waste, in violation of 18 U.S.C. §§ 1341 and 2. Finally, the indictment charged that Paccione, Vulpis, McDonald, and Environmental Contractors had schemed to defraud their medical customers of money and property by charging them high rates attributable to lawful transport, storage, and disposal of medical waste without providing those services lawfully, and had implemented that scheme through, inter alia, mailings of letters and invoices to a certain doctor, in violation of § 1341 (count 12). The alleged schemes to

defraud also formed the basis for 17 RICO predicate acts charged in counts 1 and 2.

The trial lasted 12 weeks. The jury, empaneled anonymously over defendants' objections, deliberated from May 22 to June 8, 1990, and found each of the defendants guilty on some counts and not guilty on others. All of the defendants charged in counts 3, 4, 10, and 11 were acquitted on those counts. In addition, the jury found McDonald and Environmental Contractors guilty on count 12 but not guilty on counts 1 and 2. It found Vulpis guilty on counts 1, 2, and 5–9, but not guilty on count 12. It found Paccione guilty on counts 1, 2, 5–9, and 12. It found the corporate defendants guilty on counts 1, 2, and 5–9. With respect to the RICO counts, as discussed in greater detail in Part II.C. below, the jury also completed a special verdict form, making findings on each of the alleged predicate acts.

On June 8, 1990, the district court approved the parties' June 6, 1990 letter agreement with respect to forfeitures under RICO ("forfeiture agreement"). That agreement principally removed from the jury any issue of RICO forfeitures and provided that Paccione, Vulpis, and the corporate defendants, if convicted of RICO offenses, would be jointly and severally liable to the government for $22 million, in satisfaction of forfeiture, court-imposed fines, and restitution. The forfeiture agreement established a periodic payment schedule and required that those defendants pay the government in full within 90 days. No payments were made.

On October 3, 1990, the district court sentenced Paccione and Vulpis principally to 151–month terms of incarceration, and sentenced McDonald principally to a 12–month term of incarceration and ordered him to pay a fine that later was reduced by stipulation to $79,500. For reasons discussed in greater detail in Part III.B. below, the sentences imposed on Paccione and Vulpis were more severe than those recommended in the Probation Department's Presentence Reports, in part because the district court found that Paccione and Vulpis had entered into the forfeiture agreement with intent not to perform.

### D. *The Present Appeals*

On appeal, defendants challenge their convictions on procedural and substantive grounds. In addition, Paccione and Vulpis challenge their sentences. For the reasons below, we affirm the judgments of conviction of Paccione, Vulpis, McDonald, and the corporate defendants.

We also note that Environmental Contractors, though it filed a notice of appeal, did not file a brief or otherwise pursue its appeal. Accordingly, its appeal is dismissed.

## II. CHALLENGES TO THE CONVICTIONS

Defendants challenge their convictions on the principal grounds that (1) the use of an anonymous jury deprived them of a fair trial, (2) the conduct charged to them was not within the reach of the mail fraud statute, (3) the evidence to support the mail fraud counts was insufficient, and (4) the inapplicability of the mail fraud statute invalidated the predicate acts on which the RICO convictions were premised. In addition, McDonald contends that the court erred in refusing to give a requested jury instruction; he and Vulpis challenge certain of the court's evidentiary rulings; and the Vulpis companies contend that they may not properly be held accountable for crimes committed by Vulpis. For the reasons below, we conclude that these challenges to the convictions lack merit.

### A. *The Anonymous Jury*

Upon motion of the government, the district court entered an order (a) limiting the voir dire so as not to disclose the name, address, or place of employment of any member of the venire, (b) keeping the jurors together during lunch recesses, accompanied by a United States Marshal, and (c) having the jurors transported at the end of each trial day to an undisclosed central location from which they could go home. Defendants consented to most of these measures, on condition that the jurors be

carefully instructed that the procedures adopted were intended as protection against intrusion by the media; but they objected that the nondisclosure of the jurors' names and employers would deprive them of a fair trial. They pursue this contention on appeal. We are unpersuaded.

█ In general, the court should not order the empaneling of an anonymous jury without (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected. *See, e.g., United States v. Tutino,* 883 F.2d 1125, 1132 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *United States v. Persico,* 832 F.2d 705, 717–18 (2d Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *United States v. Thomas,* 757 F.2d 1359, 1365 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985). Within these parameters, the decision whether or not to empanel an anonymous jury is left to the district court's discretion. *See, e.g., United States v. Maldonado–Rivera,* 922 F.2d 934, 971 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2858, 115 L.Ed.2d 1026 (1991).

Sufficient reason for empaneling an anonymous jury has been found to exist where, for example, the defendants "were alleged to be very dangerous individuals engaged in large-scale organized crime who had participated in several 'mob-style' killings," and there was "strong evidence of defendants' past attempts to interfere with the judicial process, and defendants were alleged to be part of a group that possessed the means to harm jurors," *United States v. Thomas,* 757 F.2d at 1364–65; or where the defendants have been charged with grand jury tampering and the trial is expected to attract publicity, *United States v. Vario,* 943 F.2d 236, 240 (2d Cir.1991); *United States v. Persico,* 832 F.2d at 717 (warranted by history of violence and willingness to corrupt and obstruct justice, together with expectation of extensive public-

ity); or where the defendant has a history of attempted jury tampering and a serious criminal record, *United States v. Tutino,* 883 F.2d at 1132–33; or where there had been extensive pretrial publicity and there were abundant allegations of dangerous and unscrupulous conduct, *United States v. Barnes,* 604 F.2d 121, 141 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).

Where jury anonymity is warranted, we have found the defendant's fundamental right to an unbiased jury is adequately protected by the court's conduct of " 'a *voir dire* designed to uncover bias as to issues in the cases and as to the defendant himself.' " *United States v. Vario,* 943 F.2d at 242 (quoting *United States v. Barnes,* 604 F.2d at 140). In addition, we have found the danger that the jury might infer that the need for additional security was attributable to the character of the defendant was minimized where the court took care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures. *See United States v. Thomas,* 757 F.2d at 1364–65 & n. 1 (explained as protection against pressures from media); *United States v. Maldonado–Rivera,* 922 F.2d at 971 (same).

█ In the present case, the government's motion expressed concern that, in light of the serious nature of the charges and the potential for long prison terms and high monetary penalties, defendants might seek to influence the outcome of the prosecution by improper means. An affirmation served with the motion stated, *inter alia,* that W & W's Weiss, named as a defendant in the indictment, had been murdered in circumstances that strongly suggested a connection to the present case and to certain of these defendants. It stated that based on public information and on confidential information from a reliable source, the government believed that Paccione was a "made" member of the Gambino Crime Family; that Vulpis was believed to have strong ties to organized crime; that various persons had been threatened by Vulpis and his associates with a baseball bat or a

pistol; and that a government witness had recently received a middle-of-the-night anonymous telephone call telling him that he would be safe so long as he " 'remembered nothing.' " The government also pointed out that the case had been front-page news and that the trial could be expected to be the subject of extensive publicity, exposing the jurors to inappropriate contacts that could compromise the trial. An additional affirmation, submitted to the court *ex parte* and *in camera* because of an ongoing grand jury investigation and the potential danger to witnesses who had testified before that body, provided details as to the gangland style of the Weiss killing and other details supporting the government's assertions as to the circumstances surrounding the killing, defendants' ties to organized crime, and the probability that that murder had been arranged by one or more of the defendants. The presentation by the government was sufficient to warrant the district court's conclusion that jury anonymity should be preserved.

We see no inadequacy in the procedural precautions taken by the court to prevent prejudice to the defendants as a result of the anonymity of the jurors. Defendants do not contend that the *voir dire* was in any way inadequate. The court also adequately instructed the jury at the outset of the trial that the special precautions were designed to protect the jury from contacts by the media, thereby implying that the security measures were not the result of threats from the defendants. Though there was evidence that some of the jurors were apprehensive about possible threats from defendants, defendants have not shown any basis for believing they were prejudiced by the court's security measures. To the contrary, the fact that the jury acquitted each of the defendants on several counts strongly indicates that those measures did not induce any lack of objectivity.

In sum, we find no abuse of discretion in the district court's decision to keep confidential the jurors' names and places of employment.

### B. The Mail Fraud Convictions

The federal mail fraud statute prohibits the use of the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court held that § 1341 is "limited in scope to the protection of property rights." *Id.* at 360, 107 S.Ct. at 2882. Though the statute reaches a scheme to obtain either tangible or intangible property rights, *see Carpenter v. United States*, 484 U.S. 19, 25–28, 108 S.Ct. 316, 320–22, 98 L.Ed.2d 275 (1987) (confidential information protected), it does not reach a scheme designed merely to deprive the citizenry of honest government, *McNally*, 483 U.S. at 356, 107 S.Ct. at 2879. In the wake of *McNally*, this Court has considered the status of federal and state licenses under § 1341 and under 18 U.S.C. § 1343 (1988), its wire fraud analogue. In *United States v. Schwartz*, 924 F.2d 410 (2d Cir.1991) ("*Schwartz*"), we concluded that an arms export license in the hands of the federal government is not property, and that the government's interest in such a license "is ancillary to its power to regulate, and [therefore] is not a property interest within the meaning of the wire fraud statute." *Id.* at 418. On the authority of *Schwartz*, we decided in *United States v. Novod*, 923 F.2d 970, 973 (2d Cir.1991) ("*Novod*"), *cert. denied,* — U.S. —, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991), a mail fraud case, that a state's interest in issuing permits to operate a dump site did not constitute property.

Defendants in the present case contend principally that the schemes of which they were accused are not within the reach of § 1341 because those schemes depended on the issuance of State and City licenses, and that defendants' procurement of such licenses, even if by means of misrepresentation and use of the mails, did not, according to *Schwartz*, deprive the City and State of property. Although, as discussed in Part II.C. below, this argument has merit with respect to one of the predicate acts charged

in the RICO counts, it has no merit with respect to defendants' convictions on the mail fraud counts.

The decisions in *Schwartz* and *Novod* must be read in light of the postures in which those cases arrived in this Court on appeal. In each, we reversed wire or mail fraud convictions because the trial court had instructed the jury that the government's right to control the issuance of its licenses was a property right. For example, though in *Schwartz* the government argued on appeal that the fraudulent procurement of the arms license had deprived the United States of property because it lost the right to seize the arms, the jury had been instructed only on the theory that the license itself was property. In *Novod*, the government had alleged that the fraudulent scheme was designed not only to obtain a state permit but also to defraud the state and its residents of funds necessary to clean a dump site and to defraud the federal and state governments of taxes; but the trial court had instructed the jury that it could convict on the basis of the first objective alone, *i.e.*, that it could convict if it found that the purpose of the scheme at issue was to obtain a dumping permit, because "as a matter of law the permit constitutes property." Neither of our decisions held that fraudulent procurement of a permit or license in order to deprive the issuing authority of money or other pecuniary interests was not within the wire or mail fraud statutes. Consistent with the boundaries of *Schwartz* and *Novod*, we have held that fees payable to the government for services or for tax purposes do constitute property for purposes of the fraud statute. *See, e.g., United States v. Helmsley*, 941 F.2d 71, 94 (2d Cir.1991) (scheme to deprive state of income taxes cognizable under § 1341); *United States v. Porcelli*, 865 F.2d 1352, 1359–62 (2d Cir.) (same re state sales tax), *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989); *United States v. Gelb*, 881 F.2d 1155, 1162 (2d Cir.) (same re postal revenue from mass mailings), *cert. denied*, 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989); *accord United States v. Dray*, 901 F.2d 1132, 1141–42 (1st Cir.) (scheme to evade legally required fees for municipal building permits actionable as mail fraud), *cert. denied*, —— U.S. ——, 111 S.Ct. 245, 112 L.Ed.2d 204 (1990).

There is no indication in the present case that the mail fraud counts were presented to the jury on an improper basis. In instructing the jury on these counts, the court told the jury generally that it must find

[t]hat at some point during the time period alleged in the charge, there existed a scheme to obtain money or property by means of false or fraudulent pretenses, representations or promises....

. . . .

The first essential element that must be established to warrant conviction of the defendants under the mail or wire fraud counts or a finding of guilty for the racketeering acts of mail ... fraud is that there existed, with respect to each count or act, a scheme or artifice to obtain money or property....

. . . .

Let me emphasize that the mail fraud statute is limited to the protection of money or property rights. Thus, it would not be sufficient for conviction under these statutes that defendants sought to deprive someone of intangible rights, such as the right of a city or State government agency to have citizens obey its regulations.

(Trial Transcript, May 21, 1990, at 7056–57.) The instructions as to specific mail fraud counts similarly focused on the victims' monetary interests. For example, with respect to counts 5–7, the court stated:

Here, the government charges several different schemes to defraud:

1. A scheme, in Racketeering Acts 1 and 2 and Counts Three to Seven, to defraud the City and State of *revenues from licensing fees and dumping fees* to be derived from the disposal of waste materials at the City-owned landfill at Fresh Kills.

(Trial Transcript, May 21, 1990, at 7057 (emphasis added).) There was no sugges-

tion to the jury that it was allowed to convict defendants of mail fraud on the basis that the City and State permits were themselves property.

As discussed below, there was ample evidence to support all of defendants' mail fraud convictions.

### 1. Counts 5–7: Defrauding the City of Revenues

■ Counts 5, 6, and 7 of the indictment charged Paccione, Vulpis, and the corporate defendants with use of the mails in furtherance of

> a scheme and artifice to defraud the City of New York of money and property, to wit, revenues from licensing fees and dumping fees to be derived from the lawful disposal of waste materials at the City-owned landfill at Fresh Kills.

In support of these counts, the government presented evidence that, by fraudulently procuring permits to deposit clean fill on the W & W property and using those permits to mask their dumping of nonclean waste—including putrescible garbage, building demolition debris, medical waste, and asbestos—in Arlington Yard, both on their property and on the CSX property, defendants deprived the City of the dumping fees to which it was entitled. In addition to lowering their own dumping costs, defendants allowed other companies to dump their nonclean waste in Arlington Yard and charged them $10 per cubic yard. The total amount of waste illegally dumped in Arlington Yard was some 550,000 cubic yards. Since the only other sizeable dump in the City was Fresh Kills and the prevailing dumping fee there during the pertinent period was $18.50 per cubic yard (and significantly higher for asbestos), the defendants' frauds cost the City more than $10 million in licensing fees. Even if one were to accept defendants' argument that some licenses were acquired that permitted the dumping of some 340,000 cubic yards of clean fill, the net loss to the City, considering the total amount dumped in Arlington Yard, was several million dollars.

■ Defendants make two additional arguments with respect to counts 5–7 that need not detain us long. First, they contend that the government's proof of mailing under counts 5 and 6 was insufficient because the alleged mailings (consisting of permits applied for by A & A) were from CDOT to CDOS, and defendants had not been informed that such mailings would occur. To come within § 1341, however, a mailing need not be by the defendant himself, so long as it was reasonably foreseeable by the defendant and furthered his fraudulent scheme. *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954); *United States v. Bronston*, 658 F.2d 920, 927 (2d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982). There can be no serious doubt that both of these requirements were met here.

Second, defendants argue that the City failed to prove any cognizable loss of dumping fees because defendants had no obligation to dump at Fresh Kills. We are unpersuaded. Fresh Kills was the largest dump site in the City. Defendants and other companies that used the A & A illegal dump site had previously dumped at Fresh Kills, and the government presented evidence showing that City revenues from that facility declined precipitously during the time of operation of the A & A dump. It was within the province of the jury to consider these facts, as well as the additional expense that would have been incurred by carters traveling to dump outside of the City, and to infer that defendants' conduct cost the City fees it would otherwise have received.

### 2. Counts 8 and 9: Defrauding CSX of the Value of Its Land

■ Counts 8 and 9 charged Paccione, Vulpis, and the corporate defendants with use of the mails to conceal from CSX the fact that defendants were causing vast amounts of garbage, asbestos, and medical waste to be dumped on CSX's property, thereby depriving CSX of the value of that property. *See, e.g., United States v. Angelilli*, 660 F.2d 23, 36–37 (2d Cir.1981) (cognizable fraud where mailings of payments to investors victimized by scheme

lulled them into false sense of security), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982). Defendants' argument that their convictions on counts 8 and 9 should be overturned on the ground that "[u]nder *McNally*, ... a scheme to damage a person's property is not a scheme to defraud him within the meaning of" the mail fraud statute (brief on appeal of Paccione, *et al.*, at 50), is frivolous. Defendants schemed to conceal from CSX their dumping of noxious wastes on its land and mailed letters to CSX containing fraudulent statements to achieve that end. Prior to defendants' dumpings, the CSX property had an estimated value for residential purposes of $20 million; after their acts, it had no value for that purpose without a clean-up expenditure of some $15 million. There can be no doubt that defendants schemed to and did deprive CSX of the value of its property, using the mails in furtherance of their scheme. This conduct was within the purview of § 1341.

3. Count 12: The Medical Waste Disposal Scam

Paccione and McDonald contend that their count 12 mail fraud convictions should be set aside principally on the grounds that (1) the medical waste scheme merely deprived Environmental Contractors's customers of an intangible right, *i.e.*, "the right to the honest services of the defendants in dumping their medical waste in a permitted site listed on defendant's waste transporter permit" (McDonald brief on appeal at 30), and hence was not actionable under § 1341 in light of *McNally* and *Schwartz;* (2) the mailings charged, "having occurred afterward" and being "incidental," were not in furtherance of a scheme to defraud; and (3) there was no evidence of any intent to defraud. Their contentions are untenable.

Count 12 charged that these defendants used the mails in order

to defraud doctors, which [*sic*] generated medical and infectious waste materials of money and property by charging them the high rates required for lawful transfer, storage and disposal of such

waste, while actually transferring, storing and disposing of the waste at far lower rates illegally, and by exposing the generators to potential civil and criminal penalties for illegal transfer, storage and disposal of such waste.

That count alleged that defendants caused the mailings of letters and invoices to one Dr. Vado, who had engaged the waste disposal services of a company other than Environmental Contractors, which had in turn hired Environmental Contractors.

■ Use of the mails in furtherance of a scheme to offer services in exchange for a fee, with the intent not to perform those services, is within the reach of § 1341. *See, e.g., McNally*, 483 U.S. at 360, 107 S.Ct. at 2881 (fraud cognizable where alleged victim would have paid less or received better quality services absent the alleged deceit); *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir.1991) ("providing alternate services does not defeat a fraud charge [when] the [victims] did not receive the services that they believed were being provided"); *cf. Schwartz*, 924 F.2d at 420–21 (use of wire facilities in connection with defendants' false assurances to its arms supplier that defendants were in compliance with government regulations was within reach of § 1343).

■ There is no requirement that the victim of the fraud be deceived by the very document that satisfies the statute's mailing requirement; rather, the requirement is merely that the mailing be "in furtherance of" the fraud. *Novod*, 923 F.2d at 973; *United States v. Bronston*, 658 F.2d at 927. Nor is there any requirement that the mailings precede the fraud. *United States v. Sampson*, 371 U.S. 75, 79–80, 83 S.Ct. 173, 175–76, 9 L.Ed.2d 136 (1962). The mailing of communications that are designed to lull the victims of the fraud into believing they have received the services they bought is sufficient to support a conviction under § 1341. *See, e.g., United States v. Angelilli*, 660 F.2d at 36–37 (fraud cognizable where mailings of payments to victimized investors lulled them into false sense of security).

■ The conduct of Paccione and McDonald fits comfortably within this framework. The fraud in obtaining permits to dispose of infectious waste was a part of the deceit employed to allow defendants to pursue a scheme that was clearly cognizable under § 1341. Environmental Contractors offered to provide doctors with infectious-waste disposal services that would be safe and adequate to relieve them of the risk of civil and criminal liability. There was no indication that any of its customers sought a lower level of service, and it was inferable that the payments of the doctors and medical facilities were to be commensurate with the high level of services promised by Environmental Contractors. Environmental Contractors mailed invoices designed to lull the customer into believing the services promised had been provided.

Defendants' reliance on cases such as *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir.1970), and *United States v. Starr*, 816 F.2d 94, 99 (2d Cir.1987), is misplaced. In the former, though the defendants had made false representations in order to gain access to potential customers, they had not misrepresented either the quality of their merchandise or the conditions of sale. In *Starr*, the defendants, who operated a bulk mailing service and were indicted for defrauding their customers, charged their customers the correct price for postage but cheated the Postal Service by "burying" higher-rate mail in sacks being used for lower-rate mail. Because the customers received the same postal service they would have received had defendants paid the full postage, the mail fraud conviction was reversed on the ground that the customers had not been defrauded. Though the Postal Service itself had been victimized, the indictment charged only that the defendants had defrauded their customers, not that they had defrauded the Postal Service.

Here there is no question that Environmental Contractors's customers did not get what they paid for. Its customers were led to believe they were purchasing careful, competent, and licensed services, together with a reduction of the risk of civil and criminal penalties for improper disposal. Instead Environmental Contractors frequently and flagrantly violated numerous SDEC regulations; its customers were exposed to substantial regulatory risks, and even had those risks not come to fruition, the fraud was complete. These customers had also requested assurance at the outset that the company was in fact licensed to handle infectious medical waste; Environmental Contractors was not so licensed and responded by sending a permit it had counterfeited; and when it did acquire its own permits, it did so by means of forgery and fraud. Defendants' suggestion that there was no evidence of an intent to defraud is frivolous.

### C. *The RICO Convictions*

Paccione, Vulpis, and the corporate defendants contend that their RICO convictions should be set aside on the ground that some of the alleged mail frauds listed as predicate acts were not within the reach of the mail fraud statute. We have dealt with most of the mail frauds above, and since we have found that they were within the scope of § 1341, there is no basis for challenging their use as RICO predicate acts. One alleged predicate act, however, was flawed as defendants contend.

■ Racketeering predicate act 12 (not to be confused with *count* 12) charged that the individual defendants and Environmental Contractors violated § 1341 by using the mails "to defraud the State of New York of money and property by awarding a lucrative waste transporter permit to [Environmental Contractors]." Notwithstanding its reference to money and property, this allegation treated the license itself as the property of which the State was defrauded. As the government concedes on appeal, this was invalid under *Schwartz* and *Novod*. Since this allegation was insufficient to charge an offense under § 1341, it was also insufficient to serve as a mail-fraud RICO predicate act.

■ This deficiency, however, does not require reversal. The jury returned a painstaking special verdict in which it made findings as to each of several defendants

with respect to 17 alleged predicate acts (many with subparts). Of the defendants found guilty on the RICO counts, only Paccione was found by the jury to have committed predicate act 12, and thus only he has standing to challenge his RICO conviction on the ground that predicate act 12 was insufficient. We reject Paccione's challenge because, for the reasons below, we conclude that the error in submitting act 12 to the jury was harmless beyond any reasonable doubt, *see* Fed.R.Crim.P. 52(a); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

In addition to predicate act 12, the jury found that Paccione had committed eight predicate acts, to wit, acts 1, 3, 4, 13, 14, 15, 16, and 17. These eight remaining predicate acts, which suffer no defects, are an ample basis for Paccione's convictions on the RICO counts. We recognize that the mere fact that a jury finds that a given defendant committed three or more predicate acts does not necessarily mean that it will convict that defendant of RICO charges—witness the fact that the jury in this case found McDonald not guilty on the RICO counts though it found that he had committed six of the alleged predicate acts (acts 12–17). But this treatment of McDonald gives us no basis for believing the jury might have found Paccione not guilty on the RICO counts if predicate act 12 had not been submitted to it. Rather, the jury's findings show that predicate act 12 simply was not an ingredient in its RICO verdicts. Thus, the jury found McDonald had committed that act, but it acquitted him on the RICO charges; it found Vulpis had not committed predicate act 12, but it convicted him on the RICO charges; and the corporate defendants were not alleged to have committed predicate act 12, and the jury convicted them on the RICO counts. The RICO convictions of Vulpis and the corporate defendants were based on the jury's findings that they committed predicate acts 1, 3, and 4, and no other predicate acts. Given all of these findings and verdicts, including the jury's finding that Paccione too committed predicate acts 1, 3, and 4 (plus five other validly submitted acts), we have no doubt that the jury would have convicted him on the RICO counts if predicate act 12 had not been submitted.

**D. *Individual Challenges to the Convictions***

Defendants make a number of individual challenges to their convictions, including (1) Vulpis's challenge to the introduction of evidence that he attempted to bribe SDEC investigators, (2) the Vulpis companies' contention that they were not responsible for derelictions of Vulpis, and (3) McDonald's contentions that the trial court erred in refusing to give a requested jury instruction and erred in certain evidentiary rulings with respect to character evidence. We have considered all of defendants' challenges to the merits and find in them no basis for reversal.

**1. Vulpis**

■ During its rebuttal case, the government was allowed to introduce evidence that, in connection with the illegal A & A landfill, Vulpis had offered SDEC officers bribes. Vulpis challenges the admission of this evidence, arguing principally that it was not probative of the issues at trial, that the unfair prejudice to him outweighed its probative value, and that he did not have proper notice that the evidence would be offered. We disagree.

Under Rule 404(b) of the Federal Rules of Evidence, relevant evidence of "other crimes, wrongs, or acts" may be admitted at trial to show, *inter alia*, that a defendant who claims that his conduct was the result of accident or mistake had the intent to commit the offense. *See* Fed.R.Evid. 404(b); *see, e.g., United States v. Mills*, 895 F.2d 897, 907 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 2216, 109 L.Ed.2d 541 (1990); *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir.1987). A defendant's attempt to bribe a law enforcement official is relevant to show his awareness that his actions were not innocent. *See, e.g., United States v. Ochs*, 595 F.2d 1247, 1260 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979); *see also United States v. Mendez–Ortiz*, 810 F.2d 76, 78–79 (6th Cir.1986) (attempt to bribe witness),

*cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 697 (1987). Evidence of such "other acts" should be excluded, however, if the trial court finds that its potential for unfair prejudice substantially outweighs its probative value. *See* Fed.R.Evid. 403; Fed.R.Evid. 404(b) Advisory Committee Note: *Huddleston v. United States,* 485 U.S. 681, 687–88, 108 S.Ct. 1496, 1500–1501, 99 L.Ed.2d 771 (1988). The trial court's decision to admit such evidence will be reversed only for a clear abuse of discretion. *See, e.g., United States v. Sappe,* 898 F.2d 878, 880 (2d Cir.1990); *United States v. Caputo,* 808 F.2d at 968.

Vulpis's principal defense at trial was that he did not intend the Arlington Yard operations to violate the law and that any impermissible dumping there was the result of accident or mistake. To substantiate that defense he was allowed, over the government's objection, to introduce testimony that Weiss had given in a civil action. In that testimony, Weiss said that when two SDEC officers discovered buried garbage at the landfill Vulpis had been "shocked" and "surprised." In response to this evidence, the government was permitted, in its rebuttal case, to offer testimony by those two officers that upon their calling the violations to Vulpis's attention, Vulpis had promptly offered them money. Accordingly, SDEC Lieutenant David Baker testified about his visit to the A & A landfill in mid-September 1988 and a conversation he had there with Vulpis. When Baker told Vulpis he was operating illegally and risking $25,000 a day in penalties, Vulpis responded, "I'm losing $75,000 a day every day the place is closed. How about $100,000, you just go away." Similarly, SDEC officer Milewski testified that on the same day, Vulpis told him he was "losing approximately $80,000, and how about $50,000." These statements by Vulpis, which the jury was plainly free to interpret as offering bribes, were relevant to show a consciousness of guilt on the part of Vulpis and thereby to cast doubt on his lack-of-intent defense. The court properly gave the jury a limiting instruction, and it was well within the court's discretion to conclude that, with that instruction, the proba-

tive value of this evidence outweighed its potential for unfair prejudice.

 Finally, we reject Vulpis's contention that the bribe evidence should have been excluded because he did not have advance notice that the government would seek to use it. In support of this contention, Vulpis relies on *United States v. Davidoff,* 845 F.2d 1151 (2d Cir.1988). His reliance is misplaced, for *Davidoff* did not involve a Rule 404(b) question; rather, we ruled that it was error for the trial court not to require the government to provide a bill of particulars identifying the alleged victims of discrete extortionate schemes that the government intended to prove as RICO predicate acts. *See* 845 F.2d at 1154. A requirement that, upon request of the defendant in a criminal case, the government give advance notice of the general nature of any other-act evidence that is to be offered at trial will soon be added to Rule 404(b). *See* Fed.R.Evid. 404(b) (effective Dec. 1, 1991: evidence of other acts is admissible to prove, *inter alia,* absence of mistake or accident, "provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial"). No such requirement was in effect, however, at the time of the trial in the present case. *See generally* 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[19], at 404–158 (1991) ("Rule 404 does not require the government to give notice of an intention to use other crimes evidence at trial.").

 In any event, even if Vulpis had been entitled to advance notice that the government would offer the bribe evidence against him, he received adequate notice. The evidence was introduced during the government's rebuttal case. The government had initially offered this evidence, on another theory, during its direct case; when it was rejected, the government pointed out that if the testimony were viewed as reflecting the offer of a bribe, it would be admissible under Rule 404(b) as

other-act evidence to meet a defense of mistake or lack of intent; the government expressly reserved its right to offer the testimony on rebuttal. The district court was not required to exclude the bribery evidence on the ground that Vulpis had not received notice.

### 2. The Vulpis Companies

The Vulpis companies contend that the jury's verdict finding them guilty on counts 1, 2, and 5–9 was not supported by sufficient evidence because the only evidence linking them to the A & A illegal operation was the fact they were 50% owned by Vulpis. They contend that they could not properly be held liable for his actions because there was no evidence that they had conferred any authority on him to involve them in the A & A landfill. This contention need not detain us long.

■ A corporation can act only through its agents, and the "acts of individuals on [the corporation's] behalf may be properly chargeable to it." *United States v. Ingredient Technology Corp.*, 698 F.2d 88, 99 (2d Cir.), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983). Thus, the corporation may be held criminally liable "for the conduct of its supervisory employees who had either intentionally disregarded the law or had acted with plain indifference to its requirements." *United States v. Demauro*, 581 F.2d 50, 54 (2d Cir.1978).

■ The evidence in the present case was sufficient to permit a rational juror to infer beyond a reasonable doubt that Vulpis's actions with respect to the A & A dump were for the benefit of and authorized by Rosedale and Vulpis Brothers, Ltd. It included proof that Vulpis owned 50% of each company; that he was an officer of each corporation; and that he largely ran their operations. Vulpis entered into the A & A partnership with Paccione for the purpose of operating the illegal dump. Vulpis helped run the dump. Truck drivers for both of Vulpis's companies testified that they daily made numerous dumps in Arlington Yard without being required to pay a fee. Use of that dump saved the Vulpis companies millions of dollars.

In short, the evidence was ample to support the convictions of the Vulpis companies on the RICO and mail fraud counts with which they were charged.

### 3. McDonald's Contentions

McDonald contends that the trial court erred in refusing to give a requested instruction to the jury and in making certain evidentiary rulings, to wit, barring McDonald's character witnesses from testifying with respect to his relationship with his son and allowing other witnesses to be questioned hypothetically with respect to McDonald's commission of crimes. For the reasons below, we find no basis for reversal.

#### a. *The Requested Instruction*

McDonald asked the trial court to charge the jury that defendants' representations that Environmental Contractors was licensed to deal with infectious medical waste were not fraudulent because defendants relied in good faith on the permits they possessed. Thus, he requested the court to instruct that "whether or not" Environmental Contractors's licenses were "fraudulently or irregularly obtained," advertisements describing the company as being licensed "w[ere] not false" and that defendants were "entitled to describe" Environmental Contractors "as licensed." McDonald contends that the trial court's refusal to give this instruction was error. It was not.

■ The trial judge is not required to give a requested charge if it lacks a foundation in law, *see, e.g., United States v. Tillem*, 906 F.2d 814, 828 (2d Cir.1990); *United States v. Ouimette*, 798 F.2d 47, 49 (2d Cir.1986), *cert. denied*, 488 U.S. 863, 109 S.Ct. 163, 102 L.Ed.2d 134 (1988), or lacks a foundation in the evidence adduced at trial, *see United States v. Leonard*, 524 F.2d 1076, 1084 (2d Cir.1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976). Where the defendant requests a charge as to his defense of good faith,

there is no basis for reversal where the court's instructions have properly explained the thrust of that defense. *See, e.g., United States v. McElroy*, 910 F.2d 1016, 1026 (2d Cir.1990); *see also Cheek v. United States,* —— U.S. ——, 111 S.Ct. 604, 611, 112 L.Ed.2d 617 (1991) (in criminal tax case, trial court should not instruct jury that, in order to negate willfulness, defendant's belief that enforcement of tax laws was unconstitutional must be objectively reasonable).

■ Here, the court gave the essence of a proper good-faith defense in its jury charge, stating as follows:

> Under the antifraud statutes, even false representations or statements or omissions of material fact do not amount to a fraud unless done with fraudulent intent. However misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith. An honest belief in the truth of the representations made by a defendant is a good defense, no matter how inaccurate the statements may turn out to be.

(Trial Transcript, May 21, 1990, at 7069–70.) This general instruction was sufficient. The record did not warrant a charge, as McDonald requested, that the individual defendants were entitled to describe Environmental Contractors as licensed. At the outset, Environmental Contractors represented that it was licensed when it was not. When doctors asked to see its license, defendants simply took another company's license and pasted Environmental Contractors's name on it, and distributed copies of the fabricated document. As a matter of law, defendants could not have had a good faith belief that their bogus document was an Environmental Contractors license. Given this record, for the court to have told the jury that defendants were "entitled to describe" Environmental Contractors "as licensed" would have been error.

### b. *The Evidentiary Challenges*

McDonald, who did not testify at trial, presented only character evidence in his defense. In addition to producing witnesses to testify to his honesty and integrity, he sought to introduce evidence that his then-teenage son had been born with cerebral palsy and that McDonald had devoted his life to caring for the son, in order to persuade the jury that McDonald would never do anything to risk imprisonment thereby disabling himself from caring for the boy. He contends that the court erroneously excluded this evidence. We find no basis for reversal.

■ The admissibility of character evidence rests in the sound discretion of the trial judge, and we will not disturb the trial court's ruling absent an abuse of discretion. *See, e.g., United States v. Davis*, 546 F.2d 583, 592 (5th Cir.) ("Rarely and only upon a clear showing of prejudicial abuse of discretion will appellate courts disturb the rulings of trial courts in the admissibility of character evidence."), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). It is within the court's discretion to exclude evidence that is prejudicial, as well as "evidence of specific acts intended to demonstrate character traits not at issue." *United States v. Wilson*, 750 F.2d 7, 9 (2d Cir.1984), *cert. denied*, 479 U.S. 839, 107 S.Ct. 143, 93 L.Ed.2d 85 (1986).

■ Here, the court properly allowed McDonald's four character witnesses to testify to their opinions that McDonald was a forthright man of honesty whose integrity was beyond reproach. It was well within the court's discretion to draw the line to exclude testimony that had no bearing on his honesty or integrity and that could well cause the jury to be influenced by sympathies having no bearing on the merits of the case.

■ McDonald's other evidentiary contention is that the court improperly allowed the government to pose questions that assumed his guilt. In *United States v. Oshatz*, 912 F.2d 534, 539 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991), decided after the trial of the present case, we held that lay character witnesses should not be asked "guilt-assuming hypothetical questions." Here, one of the government's challenged questions was:

Are you aware, Ms. Tanella, that on the permit application in the area, in the part of the permit application regarding the New Hanover Incinerator, John McDonald forged the name of another individual and wrote the name of another individual on that application?

(Trial Transcript, April 24, 1990, at 3761.) The government concedes that this question, though not in the form of a hypothetical, was improper under the spirit of this Court's ruling in *Oshatz*. We agree that the question was improper, but we regard this single improper question in the course of the 12–week trial as harmless error.

## III. CHALLENGES TO SENTENCING

Paccione and Vulpis also challenge their sentences. In calculating the offense level of each of these defendants under the applicable version of the Guidelines (referred to as "1988 Guidelines" to the extent that they differ from the 1990 version), the court arrived at a total offense level of 32. The imprisonment range for this level, in light of Paccione's and Vulpis's respective criminal history categories, was 121–151 months. Noting in its sentencing opinion, 751 F.Supp. 368 (1990), that Paccione and Vulpis had "been convicted of one of the largest and most serious frauds involving environmental crimes ever prosecuted in the United States," *id.* at 371, the court sentenced Paccione and Vulpis to 151 months' imprisonment. Paccione and Vulpis challenge various aspects of the court's calculations, including its use of the Guidelines section dealing with environmental offenses rather than that dealing with mail fraud to reach an initial offense level of 26 rather than 23, its use of the Guidelines' multiple-count rules to increase the offense level from 26 to 28, and its two-level departure increasing the offense level from 30 to 32 on the basis of its finding that Paccione and Vulpis had defrauded the government and the court in entering into the forfeiture agreement.

### A. *Use of the Environmental Offense and Multiple–Count Sections*

Under 1988 Guidelines § 2F1.1, which covered the RICO offenses and mail fraud

offenses, the district court calculated that Paccione and Vulpis would, considering enhancements for offense characteristics and adjustments for their leadership roles, have an initial offense level of 23. The court observed, however, that the Guidelines recognize that RICO and mail fraud statutes are often used as jurisdictional bases for the prosecution of other offenses, and that Application Note 15 to 1988 Guidelines § 2F1.1 provided that "[i]n such cases the most analogous guideline ... is to be applied." Finding that defendants' illegal dumping of waste had "caused serious environmental harm," 751 F.Supp. at 376, the court concluded that the most analogous Guidelines provision was § 2Q1.2, which deals with offenses involving the mishandling of hazardous or toxic substances. Calculating offense levels under this section, with enhancements for offense characteristics and adjustments for leadership roles, the court concluded that the proper initial offense level was 26. These calculations followed the recommendations of the Presentence Reports ("PSRs") prepared by the Probation Department. They were not objected to by Paccione or Vulpis in the district court.

The court also noted that if Paccione and Vulpis were to be sentenced under § 2F1.1, the mail fraud section, instead of under § 2Q1.2, their initial offense level would still have been 26, not 23, because the court would have departed upwardly under Guidelines § 5K2.0 or § 5K2.5 to take into account the serious environmental harm and its "very strong nexus" with the fraud. 751 F.Supp. at 375 n. 4. The court stated as follows:

This court could have chosen not to look at the environmental offenses at all but rather to sentence the defendants pursuant only to the fraud offense. If that had been the case, this court would have had to substantially depart upward to capture the harm which defendants caused to both the CSX land and the environment. In deciding how many levels to depart upward, this court would have looked to the environmental offense guidelines as a template. Thus the de-

fendants would have had the same offense level whether this court ... looks at the environmental offenses or whether this court used its discretionary powers under § 5K2.0 or § 5K2.5.

751 F.Supp. at 375 n. 4.

Having calculated defendants' initial offense level as 26, the court next looked to the Guidelines' multiple-count rules and determined that the environmental offenses were separate from the mail fraud offenses, and thus could not be grouped together as a single offense under § 3D1.2 but rather required a further adjustment under § 3D1.4. The court concluded that application of the latter section resulted in a two-level adjustment, giving these defendants an interim offense level of 28. This calculation too followed the recommendations of defendants' respective PSRs and was not objected to by Paccione or Vulpis in the district court.

The court also noted, however, that if it had not concluded that the Guidelines required this upward adjustment under the multiple-count rules, it would have departed upwardly by two levels, still resulting in an interim offense level of 28:

> Alternatively, if this court were only able to look at the environmental offense, this court would have had to depart upward under § 5K2.0 to take into account the fact that the defendants had defrauded various agencies and individuals. Under these circumstances, this court would have departed at least two levels. Thus the resulting level would have been the same even if the court did not use the multiple count adjustment.

751 F.Supp. at 378 n. 7.

Paccione and Vulpis contend here that the sentencing court erred (a) in calculating their offense levels using the environmental offense section of the Guidelines, rather than the section dealing with mail fraud, resulting in an initial offense level of 26, rather than 23, and (b) in using the multiple-count sections to increase their interim offense levels to 28. Though the latter contention has some merit and the former gives us pause, we conclude that, given the court's alternative rulings, these matters do not require recalculation of the sentences.

Preliminarily, we note that, as indicated above, these two adjustment objections were not voiced in the district court. Given the complexity and novelty of this type of case, however, we find it appropriate to consider these issues on appeal. *See, e.g., United States v. McCall,* 915 F.2d 811, 814 (2d Cir.1990); *see also United States v. Rodriguez,* 943 F.2d 215, 216–17 (2d Cir. 1991). Accordingly, we address the propriety of the court's use of the environmental sections found in Chapter Two of the Guidelines and the multiple-count sections found in Chapter Three.

The challenge to the district court's use of the environmental offense sections presents interesting questions. The Guidelines provide that, for calculation of a defendant's offense level, the applicable guideline section is generally to be determined with reference to the offense of conviction. Thus, § 1B1.2(a) instructs the court, where there has been no plea of guilty or nolo contendere establishing a more serious offense than the offense of conviction, to "[d]etermine the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction (*i.e.,* the offense conduct charged in the count of the indictment or information of which the defendant was convicted)."

In the present case, the indictment charged defendants with mail fraud, wire fraud, and RICO offenses; they were convicted of mail fraud and RICO offenses. Thus, under § 1B1.2(a), defendants' offense level would have been calculated under the Guidelines section dealing with mail fraud, *i.e.,* 1988 Guidelines § 2F1.1, yielding an offense level of 23. *See* Guidelines § 2E1.1 (for RICO, base offense level is 19 or offense level applicable to the underlying racketeering activity, whichever is higher). A problem arises because an application note to the mail fraud section stated that

> [i]n certain other cases, the mail or wire fraud statutes, or other relatively broad statutes, are used primarily as jurisdic-

tional bases for the prosecution of other offenses. For example, a state law arson where a fraudulent insurance claim was mailed might be prosecuted as mail fraud. *In such cases the most analogous guideline (in the above case, § 2K1.4) is to be applied.* 1988 Guidelines § 2F1.1 Application Note 15 (emphasis added). On the face of it, this Note appears to direct the district court to proceed precisely as it did in the present case, *i.e.*, not to use the fraud section but to use the section dealing with environmental offenses. The difficulty, since defendants were not charged with or convicted of environmental offenses, is that 1988 Guidelines § 2F1.1 Application Note 15 appears to conflict with § 1B1.2(a)'s requirement that calculation of offense level proceed under sections dealing with the "offense of conviction (*i.e.*, the offense conduct charged in the count of the indictment or information of which the defendant was convicted)."

Our view that the two provisions were in conflict here is supported by the current version of the corresponding application note (now numbered 13) to § 2F1.1. This version, which became effective on November 1, 1989, authorizes the court, upon a mail fraud conviction, to apply a section other than § 2F1.1 only if the other section deals with an offense that was "establish[ed]" in the information or indictment. Thus, the amended version deleted the language of the 1988 version's Note 15 emphasized above and substituted the following:

> Where the indictment or information setting forth the count of conviction (or a stipulation as described in § 1B1.2(a)) establishes an offense more aptly covered by another guideline, apply that guideline rather than § 2F1.1. Otherwise, in such cases, § 2F1.1 is to be applied, but a departure from the guidelines may be considered.

Guidelines § 2F1.1 Application Note 13. The explanation of the Sentencing Commission reveals that the major "purpose[ ] of this amendment [was] to ensure that this guideline is interpreted in a manner consistent with § 1B1.2." Guidelines App. C, Amendment 155.

This amended version of § 2F1.1 was in effect at the time defendants in the present case were sentenced, and were we to apply the amended version, we would likely conclude that the district court should not have calculated their offense levels under the environmental offense sections. Normally, of course, the court is to apply the version of the Guidelines that is in effect at the time of sentencing, *see* 18 U.S.C. § 3553, unless there is an ex post facto problem. *United States v. Adeniyi*, 912 F.2d 615, 618 (2d Cir.1990); *cf. Miller v. Florida*, 482 U.S. 423, 435–36, 107 S.Ct. 2446, 2453–54, 96 L.Ed.2d 351 (1987) (application of state's revised sentencing guidelines, in effect at time of defendant's sentencing, violates ex post facto clause if it " 'makes more onerous the punishment for crimes committed before its enactment' ") (quoting *Weaver v. Graham*, 450 U.S. 24, 36, 101 S.Ct. 960, 968, 67 L.Ed.2d 17 (1981)). The application of the amended § 2F1.1 here would have created an ex post facto problem because the amended § 2F1.1 also modified the offense level enhancements for specific offense characteristics; thus, the initial offense level for Paccione and Vulpis under the amended version, after enhancements and leadership adjustments, would be 28, as contrasted with a level of 23 under the 1988 version. As a result, though application of the version of § 2F1.1 in effect at the time of sentencing would appear to prevent calculation of defendants' offense levels under the sections governing environmental offenses, it would also result in a higher offense level. Hence, the version of the Guidelines in effect at the time of sentencing could not be applied, and application of the 1988 version of the Guidelines was required.

Accordingly, we are left with the question of whether the direction given in Application Note 15 to 1988 Guidelines § 2F1.1 overrode the instructions given in § 1B1.2. From the 1989 amendment and the Commission's explanation for the amendment, it is clear that the Commission recognized the possibility of erosion of § 1B1.2, but that none was intended. Fortunately, however,

we need not resolve the conflict between apparent effect and later-clarified intent, for the district court stated an alternative basis for its arrival at an offense level of 26.

■ The court stated that if it had sentenced Paccione and Vulpis under § 2F1.1 it would have, under Guidelines § 5K2.0 or § 5K2.5, "substantially depart[ed] upward to capture the harm which defendants caused to both the CSX land and the environment." 751 F.Supp. at 375 n. 4. Section 5K2.0 provides that the "sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds 'that there exists an aggravating ... circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" Guidelines § 5K2.0 (quoting 18 U.S.C. § 3553(b)); *see generally United States v. Kim*, 896 F.2d 678, 681–83 (2d Cir.1990). Since there is no indication that when it formulated punishments for mail fraud, the Commission took into account the possible causation of massive environmental damage such as that proven here, a § 5K2.0 departure would not have been an abuse of discretion. We therefore see no basis for disturbing the court's arrival at an initial offense level of 26.

There is also a difficulty, together with a similar curative alternative holding, in connection with the court's use of the Guidelines' multiple-count provisions to increase defendants' offense level from 26 to 28. The court referred to § 3D1.2 to determine whether "the fraud offense and the environmental offense can[ ] be grouped together," 751 F.Supp. at 377; determining that they could not be grouped, it concluded that § 3D1.4 therefore required a two-level upward adjustment. The multiple-count sections, however, provide rules for calculating, either by grouping or by adjustment, a single offense level that takes into account all of "the counts of which the defendant is convicted." Guidelines Chapter Three, Part D—Multiple Counts, Introductory Commentary. The underlying premise of either grouping or adjustment under these rules is that there have been multiple counts and multiple convictions. *See generally United States v. Blanco*, 888 F.2d 907, 909–11 (1st Cir.1989) ("Guidelines provide[ ] that, for the most part, the court will determine the *applicable guideline* by looking to the charge of which the offender was convicted" (emphasis in original); other conduct not charged as an offense may be taken into account under relevant conduct rules or in departure from the Guidelines, not under multiple-count rules). Here, no counts of the indictment charged Paccione and Vulpis with violation of federal environmental laws, and they were not convicted of environmental offenses. Accordingly, the only offenses subject to the multiple-count rules were the RICO and mail fraud offenses.

Again, however, there is no basis for resentencing, for the court stated that if no upward multiple-count adjustment were proper, the court would, under § 5K2.0, depart upwardly by two levels. For the reasons indicated above, such a departure would not have been an abuse of discretion.

**B.** *Departure for Failure To Perform Forfeiture Agreement*

The district court's final upward departure, from level 30 to level 32, was based on the defaults of Paccione and Vulpis on their obligations under the forfeiture agreement. The agreement, dated June 6, 1990, and so-ordered by the court on June 8, made Paccione and Vulpis and their respective companies jointly and severally liable to pay the government, if they were convicted under RICO, a total of $22 million in lieu of forfeitures, restitution, and fines. The agreement called for defendants to make a $4 million payment within 30 days after the agreement was signed, another $8 million within 60 days after signing, and the remaining $10 million within 90 days after signing. Thus, the entire $22 million should have been paid to the government by early September 1990. Defendants made no payments whatever.

The government entered default judgments against these defendants following

their initial failure to perform; and, in part relying on the total default, it urged the district court not to follow PSR recommendations that Paccione and Vulpis be given sentencing credit for acceptance of responsibility. At a September 11, 1990 hearing with respect to the PSR recommendations, the court asked the government to advise it of the status of the forfeiture agreement as far as Paccione and Vulpis were concerned.

The government attorney stated that there had been no payments, interim or final. He stated that a few contracts for sales of assets of the Paccione and Vulpis companies had been submitted to the government, but that they would result in negligible front-end cash payments and in extended payment schedules. The government was pursuing its default judgments and had sought to take depositions to identify assets with which to satisfy the judgments. It had scheduled depositions of Paccione and Vulpis but canceled them when it was advised that both men would invoke the Fifth Amendment. It had also noticed the deposition of a proposed purchaser of certain Paccione company routes; but it was not certain whether that deposition would proceed either, since there had been a suggestion that the purchaser, a relative of Paccione by marriage, would decline to answer any question dealing with the bona fides of his purchase contract. Following the government's representations, which were not disputed, the court ordered a hearing to permit it to determine whether, in entering the forfeiture agreement, Paccione and Vulpis had intentionally defrauded the government.

At the September 12, 1990 hearing, the court heard testimony from witnesses called by Paccione and Vulpis, discussed in greater detail below, and heard argument from both sides. Additional information was presented at an October 3, 1990 hearing. Thereafter, addressing Paccione's attorney, the court stated,

> [i]t is my finding that this constitutes the biggest fraud that I have any personal knowledge of on the United States Government that I have seen since I have been on the bench. And that's

what we got here. A perfect fraud by you[r] client, Mr. Paccione and whoever assisted him in this misrepresentation that he would have the ability to produce $22 million by September the 8th.

(Sentencing Transcript, October 3, 1990, at 57.) In its sentencing opinion, the court found "that both defendants intentionally entered into the $22 million agreement without bona fide purchasers in sight knowing that the businesses could not be sold within the ninety day period because of procedural requirements," 751 F.Supp. at 381, and stated as follows:

> [P]rior to the jury's verdict, defendants entered into a Settlement Agreement with the Government that provided that if defendants were found guilty, they would pay the Government $22 million in lieu of forfeiture and fines. . . . Under the terms of the agreement, defendants were jointly and severally liable. In exchange defendants received a complete resolution to any financial penalties rather than allowing the jury to determine any possible forfeiture and the court any possible fines. Under the agreement, the entire $22 million was due, in full, by September 8, 1990, after two prior installment payments. Sentencing was scheduled for September 12, 1990. The agreement contemplated that the money would be raised by the selling off of the numerous waste carting businesses which Paccione and Vulpis owned and which corporations were also defendants in this case. This court approved the agreement as requested by the parties.
>
> As of this date, however, defendants have not paid one penny to the Government. Defendants claim that they were unable to make the required payments because of difficulty in selling their businesses. This court concludes that defendants had difficulty selling their business, but it is also the view of this court that defendants knew full well when they entered into the agreement that they would be unable to sell their businesses within the short amount of time for which the agreement provided without prior offers to buy from bona fide

purchasers. The private waste carting business is a closed market and potential buyers consist largely of friends and relatives of defendants.... The court finds and concludes that friends and relatives cooperated with defendants in not purchasing the lucrative businesses owned by defendants and allowing defendants to remain in possession. Defendants had to have been aware of the fact that there would not be any buyers when they entered into the agreement. Defendants' actions caused the question of forfeiture to be taken away from the jury and has caused this court's hands to be tied with respect to the fines.

In addition, there was also testimony that, even if defendants had entered into a contract with a buyer, it could take as much as two years to obtain a license from New York City's Department of Consumer Affairs.... Paccione and Vulpis, who were both involved in the carting business for many years before their trial, were aware of the procedures involved in selling a business and had to know that a sale of a business in such a short time, even with a ready, able and willing, buyer, was close to impossible.

....

This court finds that defendants' actions constitute a fraud upon both the Government and this court because the agreement caused the issue of forfeiture to be withdrawn from the jury and prevents the court from imposing fines.

*Id.* at 379–80.

Finding that these were unusual circumstances not adequately considered by the Sentencing Commission, the court concluded that it had discretion to depart upwardly under § 5K2.0. It chose to add two levels because defendants' conduct was closely analogous to obstruction of justice, for which the Guidelines provide a two-level upward adjustment. *See* Guidelines § 3C1.1 ("If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."). The court stated that as an alternative to depar-

ture, it would have adjusted the offense level upward by two levels pursuant to § 3C1.1.

Paccione and Vulpis argue here that any increase in the severity of their sentences on the basis of fraud in entering the forfeiture agreement was impermissible because (a) the court erroneously placed on them the burden of proving their intent to perform, (b) the evidence did not support the court's finding that they entered into the agreement without intent to perform, and (c) it was unfair to penalize them for failing to perform while allowing the government to enforce the agreement. We reject all of their contentions.

■ First, we see no merit in defendants' suggestion that the district court misallocated the burden of proof. At the end of the September 11 hearing, following the government's representations as to nonperformance, the court stated as follows:

THE COURT: .... I consider at the moment that there has been a major fraud committed here on the part—with the government as the victim.... The present fraud makes pale and insignificant the fraud prosecuted in the trial, so you've got a chance to prove otherwise, and you better start tomorrow morning.

....

THE COURT: ... I have said we are going to have a hearing on this because I believe the government has been defrauded and that the court has been misled. Now you are going to have your chance to prove otherwise.

(Sentencing Transcript, September 11, 1990, at 97.) We do not see in this statement or in any other an indication that the court placed the burden of proof, as contrasted with the burden of going forward, on Paccione and Vulpis. Rather, the court merely indicated that the government—having represented without contradiction that, *inter alia,* in the agreed 90–day period Paccione and Vulpis had not paid the government a cent, that the few contracts for sales of assets that defendants had negotiated were for small fractions of the

sum due, that these would result in payouts measured not in days but in years, and that defendants and one of their prospective purchasers were invoking Fifth Amendment privilege with respect to the bona fides of these sales—had established a prima facie case. Thus, at the hearing, the court stated, "I also suggested that, prima facie, that looks like a major fraud...." (Sentencing Transcript, September 12, 1990, at 126.) The government having shown facts from which intent not to pay could be inferred, the court merely informed Paccione and Vulpis that it was their burden to come forward with evidence to rebut the government's prima facie case. The court's eventual findings also reflect no misallocation of the ultimate burden of proof. The court did not at all suggest that defendants had merely failed to prove their intent to perform. Rather, it found affirmatively "that defendants knew full well when they entered into the agreement" that they would not perform.

Nor are we persuaded that the evidence was insufficient to support the court's finding that Paccione and Vulpis had entered into the forfeiture agreement without the intent to perform their obligations under it. Such a finding need be supported only by a preponderance of the evidence, *see, e.g., United States v. Shoulberg,* 895 F.2d 882, 886–87 (2d Cir.1990); *United States v. Guerra,* 888 F.2d 247, 251 (2d Cir.1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990), and it may not be overturned unless clearly erroneous, 18 U.S.C. § 3742(e) (1988); *see United States v. Santiago,* 906 F.2d 867, 871 (2d Cir.1990); *United States v. Parker,* 903 F.2d 91, 103 (2d Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990); *United States v. Shoulberg,* 895 F.2d at 884. The evidence, taken in the light most favorable to the government, included the following.

Paccione and Vulpis did not testify but introduced the testimony of their accountants, of attorneys who had attempted to negotiate sales of some of their companies' assets, and of court-appointed monitors who had been supervising the operations of the corporate defendants for more than a year prior to the signing of the forfeiture agreement. Principally through their attorneys, Paccione and Vulpis argued that they had expected in good faith to be able to sell enough assets to pay the government $22 million in 90 days. But the evidence was that when they entered into the forfeiture agreement, they had no purchasers waiting in the wings. Further, they indicated that they had expected to find purchasers easily and that they were surprised to find that potential purchasers were slow to agree to pay full value because once Paccione and Vulpis were convicted potential buyers believed they could get bargains because Paccione and Vulpis were required to sell to perform the forfeiture agreement. In light of defendants' extensive business experience and the facts that the agreement envisioned assets sales and that it provided for forfeiture only if defendants were convicted, the court was hardly required to credit these professions of surprise. In addition, the witnesses indicated that, as these experienced defendants would know, once a sale contract is executed, it normally takes longer than 90 days (three months to two years, according to Paccione's attorney) to obtain the necessary local regulatory approvals.

Defendants' witnesses also indicated that contracts for sales of carting routes normally call for very small cash down payments and very long payouts. Further, even the small monthly payments called for by the contracts they negotiated were subject to reduction if income from the sold routes decreased. Thus, the contracts that were negotiated, far from meeting defendants' obligations to pay $22 million in 90 days, provided them with no funds to pay the government anything within 90 days, provided them with little more than $1 million to pay the government upon regulatory approval of the sales, and would have dribbled the rest of the $22 million to the government over a period of many years. Along the same lines, Vulpis's father in August 1990 offered a modification of the forfeiture agreement insofar as Vulpis's presumed share was concerned: he offered to pay the government $100,000 (increased to $500,000 two days before the hearing),

to be followed by payments of $100,000 per month for 12 years.

It is also noteworthy that though Paccione and Vulpis claimed to have believed in good faith that they would be able to pay the government the entire agreed amount within 90 days of signing the forfeiture agreement, they made little effort to show that they had had any good faith belief that they could pay the government the $4 million they agreed to pay within the first 30 days or the additional $8 million they agreed to pay within the second 30 days. Vulpis sought to show that he had attempted to obtain a $2 million mortgage during the first month after the forfeiture agreement; he apparently was surprised that the bank would not lend him $2 million when it learned he was about to go to jail.

The court was also entitled to believe that the testimony presented by Paccione and Vulpis as to the timing of their efforts to sell assets tended to detract from, rather than support, their protestations of good faith. Paccione, for example, had entered into four contracts that were supposed to generate money to pay half of the $22 million; of these four (which cumulatively called for front-end cash payments of only some $1.2 million), only one, for $1.5 million, was executed prior to the expiration of the 90–day period. None of the contracts had been approved by the local regulatory agency. Vulpis's attorney had negotiated toward two sales of assets; one sale apparently fell through in July. A proposed contract for the other was not sent to the purchaser until August 28; by the September 12 hearing, Vulpis's attorney had heard nothing from the purchaser and had not followed up.

In sum, viewed in the light most favorable to the government, the evidence showed that Paccione and Vulpis had not paid the government a penny of the sums due; that their efforts to sell assets were few and late; and that they had promised to make payments totaling $22 million within 90 days knowing that if convicted they would be under pressure to sell assets, knowing they had no purchasers lined up, knowing that most contracts are for small amounts of cash and extended payouts, and knowing that most sales require considerably longer than 90 days just to receive local regulatory approval. On the present record, we cannot say the district court's finding that Paccione and Vulpis entered into the forfeiture agreement without the intent to perform it was clearly erroneous.

Finally, we see no merit in defendants' argument that, because the government retained the right to enforce the forfeiture agreement, it was unfair for the court to consider their fraud as a ground for increasing their prison terms. In support of this argument, Paccione and Vulpis urge us to treat this matter strictly as a contract dispute. Though contract principles obviously are material, *see Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), we reject defendants' argument both because the sentencing context cannot be ignored and because in fact defendants received the principal benefit of their bargain and the government did not.

To begin with, we note that the forfeiture agreement did not purport to affect the prison terms to which Paccione and Vulpis could be sentenced. Rather, the agreed forfeiture was to be "in full satisfaction of the forfeiture penalties [for RICO conviction], as contained in paragraphs 64 through 68 of [the indictment], as well as whatever fines and restitution might otherwise be imposed pursuant to Title 18, United States Code." The cited paragraphs of the indictment sought to compel the individual defendants, *inter alia,* to forfeit their interests in the corporate defendants, as well as all proceeds of defendants' racketeering activity. *See, e.g.,* 18 U.S.C. § 1963(a)(2)(A) (forfeitability of interest in RICO enterprise); *id.* § 1963(a)(3) (forfeitability of property constituting or derived from proceeds of racketeering activity). Had the forfeiture issue been submitted to the jury, the jury could have stripped Paccione and Vulpis of their interests in their respective companies (having a conceded value of at least $27–$53 million); or it could have determined

that the proceeds of the defendants' racketeering activity included $20 million for the taking of CSX's property, plus all dumping fees charged by A & A, all dumping fees saved by the corporate defendants, and all derivative proceeds from the activity, perhaps totaling more than $10 million. Hence, jury-determined forfeitures could easily have totaled $30 million or more. Moreover, in the absence of the forfeiture agreement, the court could have ordered defendants to make restitution to CSX and the City, the victims of their racketeering activity, in addition to any RICO forfeitures. *See* 18 U.S.C. §§ 3663(a)(1), (a)(2), and (b)(1)(B) (court may order defendant to make restitution to RICO victim of the value of the property lost); *United States v. Robilotto*, 828 F.2d 940, 944, 949 (2d Cir.1987) (no Eighth Amendment violation in sentence requiring defendant both to forfeit moneys to United States and to make restitution to victim), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988); *United States v. Feldman*, 853 F.2d 648, 660, 663 (9th Cir.1988) (same), *cert. denied*, 489 U.S. 1030, 109 S.Ct. 1164, 103 L.Ed.2d 222 (1989). Thus, the monetary risks to Paccione and Vulpis upon conviction of RICO offenses totaled some $30–$80 million. By entering into the forfeiture agreement, however, they limited their risk of financial penalties to $22 million.

Defendants have retained this bargained-for limitation despite their defaults. The district court found itself barred from imposing fines on them or ordering restitution. By the time defendants defaulted, forfeiture questions could no longer be submitted to the jury. And defendants' assets worth upwards of $53 million, though subject to a sheriff's auction to permit collection of the $22 million, are not themselves forfeited by reason of the defaults. *See United States v. Paccione*, 948 F.2d 851 (2d Cir.1991).

The government, on the other hand, though it has the right to enforce default judgments against Paccione and Vulpis, has hardly received the principal benefit of its bargain. It was to receive $22 million in cash within 90 days, thereby receiving the monetary penalties for the RICO convictions without further effort on its part. Instead the government received nothing and is required to engage in perhaps protracted court proceedings, pursue defendants' assets, and attempt to sell those assets in order to collect its judgments. *See United States v. Paccione*, 948 F.2d 851 (2d Cir.1991) (government required to follow state creditor procedures to collect its $22 million).

Given the district court's adequately supported finding that defendants had entered into the forfeiture agreement without intending to perform it, we see nothing in the Guidelines or in logic to suggest that the conduct of Paccione and Vulpis should not have been considered attempts to "impede[ ] the administration of justice during the ... sentencing of the instant offense" within the meaning of Guidelines § 3C1.1, warranting a two-level upward adjustment in offense level. If the present type of fraud was not envisioned by that section, an upward departure under § 5K2.0 was hardly an abuse of discretion.

## CONCLUSION

We have considered all of defendants' arguments on these appeals and have found in them no basis for reversal. The appeal of Environmental Contractors is dismissed. The judgments of conviction of the other defendants are affirmed.