942 P.2d 522

STATE of Hawai'i, Plaintiff–Appellee,

v.

Edward Shawn VILLEZA,
Defendant–Appellant.

No. 17703.

Supreme Court of Hawai'i.

July 8, 1997.

Ray Allen Findlay, on the briefs, Honolulu, for defendant-appellant.

Caroline M. Mee, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee.

Before McCONNELL, Acting C.J., in place of MOON, C.J., recused; MASUOKA, Circuit Judge, in place of KLEIN, J., recused; IBARRA, Circuit Judge, in place of LEVINSON, J., recused; SHIMABUKURO, Circuit Judge, in place of NAKAYAMA, J., recused; and TOWN, Circuit Judge, in place of RAMIL, J., recused.

McCONNELL, Acting Chief Justice.

Defendant-appellant Edward Shawn Villeza appeals after jury conviction and sentence for the offense of manslaughter in violation of Hawai'i Revised Statutes (HRS) § 707–702 (1993).

For the reasons set forth below, we affirm.

## I. *BACKGROUND*

Villeza was convicted of murder in the second degree for shooting his mother. The conviction was reversed due to an erroneous jury instruction, and the case remanded for a new trial. *State v. Villeza*, 72 Haw. 327, 817 P.2d 1054 (1991).

### A. *Jury Selection and Motion to Quash Indictment*

At jury selection in the retrial, the trial court redacted potential jurors' street addresses and home and work telephone numbers from the juror qualification forms. Villeza objected, arguing that the failure to supply prospective jurors' street addresses and telephone numbers violated his rights to effective assistance of counsel and due process. The redacted forms provided the general geographic location and zip code of each juror's residence, each juror's occupation, employer, date of birth, years of residence in the State of Hawai'i, educational background, and other personal information.

Villeza moved to quash the indictment based on the redaction of the juror qualification forms. Villeza contended the redaction

violated HRS § 612–17 (1993) and his constitutional rights to due process, equal protection, and effective assistance of counsel. Villeza offered evidence that juror qualification forms were not redacted in civil trials and argued that the trial court arbitrarily singled out a class, criminal defendants in jury trials, for unequal treatment. Villeza claimed redaction of the forms hampered his ability to investigate prospective jurors. The court took judicial notice that judges in the Criminal Division of the First Circuit Court redacted home street addresses and telephone numbers from the qualification forms but provided each juror's residential community name and zip code. The court denied Villeza's motion to quash the indictment.

## B. *Sentencing*

On retrial, the jury found Villeza guilty of the lesser included offense of manslaughter by reckless conduct.[1] The State moved the court to order a psychiatric or psychological examination of Villeza to determine whether he was a dangerous person who should be sentenced to an extended term of imprisonment pursuant to HRS §§ 706–661 and 706–662(3) (1993). At the hearing on the State's motion, Villeza stated that he would exercise his fifth amendment right and refuse to speak to any mental health examiner. The court granted the State's motion.

Dr. Jack Annon was appointed to examine Villeza. Dr. Annon withdrew because he had worked on Villeza's case for the public defender's office. The court then appointed Dr. Daniel Reed to examine Villeza. Dr. Reed informed the court that he could not make a determination of Villeza's dangerousness because, among other reasons, he had no opportunity to interview Villeza.

The State moved to continue the sentencing date and for appointment of another psychiatrist or psychologist to assess Villeza's dangerousness. Villeza opposed the motion, arguing there could be no enhanced sentence because a dangerousness evaluation had not been made by the sentencing date. The

court granted the State's motion to continue the sentencing date and directed that the judge in charge of selecting the mental health professional be informed that a "mental health expert who will be able to express an opinion, whatever the opinion may be, without having access to the Defendant" was needed.

Dr. John Wingert, a clinical psychologist, was appointed. Dr. Wingert assessed Villeza and submitted his findings to the court. Based upon Dr. Wingert's determination that "Villeza ha[d] a significant history of dangerousness to others resulting in criminally violent conduct," the State moved for an extended term of imprisonment.

At the sentencing hearing, Dr. Wingert testified that, as a consultant to Child Protective Services, he had performed hundreds of dangerousness evaluations without interviewing the subject individual. He explained that a psychological assessment of dangerousness consists of a review of all available data, including anecdotal information, police records, interviews, probation reports, and other available records. The doctor further testified that, if possible, interviews with individuals who have first hand knowledge of the person should be considered. Dr. Wingert interviewed Villeza's brother and sister, two next door neighbors, and Honolulu Police Department Officer Hector Rivera (Officer Rivera), who was a police officer involved in the instant case as well as other incidents at the Villeza house. Dr. Wingert reviewed police interviews, copies of temporary restraining orders filed by Villeza's mother and sister, and adult probation records. Based upon the records sent to him, as well as the interviews, Dr. Wingert concluded to a reasonable clinical psychological certainty that Villeza's significant history of dangerousness made him a serious danger to others.

On cross-examination, Dr. Wingert opined he did not conduct what he considered, in "professional terminology," a psychological evaluation of Villeza because he was unable to interview Villeza face-to-face. Claiming

---

1. Except for his objections to the redaction of the juror qualification forms, Villeza raises no other trial errors. At trial, Villeza testified in his own behalf and admitted shooting his mother in the head, but claimed he did so accidentally while cleaning his gun. Villeza testified that he hid his mother's body in the back yard, then wiped away the blood, and hid his gun in the attic.

there was insufficient foundation to support Dr. Wingert's findings, Villeza moved to strike Dr. Wingert's testimony. The State argued Dr. Wingert's procedures were acceptable in the community, a face-to-face interview is not a prerequisite to a dangerousness evaluation and, if it were, the State could never secure an extended term sentence under the applicable statute when a defendant refused to be interviewed. The trial court denied Villeza's motion to strike Dr. Wingert's testimony.

Officer Rivera testified that, in the years prior to Mrs. Villeza's death, he had been called to the Villeza house because Villeza had threatened family members and refused to leave the house.

Jarvis Claussen testified that he had been Villeza's neighbor for many years. He described incidents of violence in which Villeza chased his sister with a butcher's knife, hit one of Claussen's sons in the head, and threw a rock at Claussen. Claussen's son, Matthew, testified Villeza had repeatedly threatened him.

Villeza's brother, Brent Ian Villeza (Ian), testified Villeza began showing violent tendencies as a teenager, that Villeza shot Ian with a BB gun, and that Villeza hit Ian on the head with a brick. According to Ian, starting in 1987, Villeza repeatedly threatened to kill him and once threatened to break his neck. Ian further testified that Villeza punched his sister in the mouth, knocking out two teeth. Ian testified that he feared for his life and believed his brother was crazed or violent.

Villeza's witness, Dr. Daniel Reed, testified he reviewed the same information reviewed by Dr. Wingert, but was unable to make a determination of dangerousness.

The court granted the State's motion for extended sentencing and sentenced Villeza to twenty years imprisonment.

## C. *Filing of Quo Warranto Petition*

Before the final sentencing hearing, Villeza filed a "Motion for Leave to File a Civil Complaint Re: Petition for Writ of Quo Warranto Against Daniel G. Heely Who Acts as a Judge in the First Circuit Court" (motion for leave). Villeza argued Judge Heely vacated his position as circuit court judge when he assumed the duties of the administrative director for the courts and, therefore, had no authority to sentence Villeza.

Prior to the sentencing hearing, defense counsel informed Judge Heely of the *quo warranto* proceeding and explained that he believed such proceeding was integral to affording effective assistance of counsel and due process of law. Defense counsel suggested Judge Heely would be contravening the lawful power of the judge scheduled to hear the motion for leave if he proceeded with sentencing. Defense counsel informed Judge Heely that he had filed an ethics complaint with the Office of Disciplinary Counsel regarding Judge Heely's alleged dual positions.[2]

After reviewing and addressing Villeza's motion, Judge Heely proceeded with sentencing. The court marked as an exhibit and read into the record an August 9, 1993 order signed by the Hawai'i Supreme Court justices. The order transferred the functions of the administrative director to the First Division of the First Circuit Court, Judge Heely presiding. Judge Heely reiterated that he was a sitting circuit court judge, had not resigned his office, and stated:

> Any administrative functions I am exercising in the office of the administrative director of the court is at the request and direction of the Justices of the Hawaii Supreme Court pursuant to the orders I just read in the record. And further, there is no prohibition in any Hawaii Revised Statutes or under any state or federal constitutional provisions which prohibit a sitting judge from exercising administrative duties in the context of what I just read into the record pursuant to the order of the Hawaii Supreme Court.

With respect to the disciplinary complaint, Judge Heely stated the arguments within the

---

2. We note that complaints against judges should be filed with the Commission on Judicial Conduct, Rules of the Supreme Court of Hawai'i

(RSCH) 8.2(b) and (c), not with the Office of Disciplinary Counsel.

motion and the appended petition for writ of *quo warranto* were insufficient to postpone sentencing and were clearly insufficient to require disqualification for bias or prejudice under HRS § 601–7 (1993). Judge Heely granted the State's motion for extended term sentencing.

## II. *ISSUES*

Essentially, Villeza presents four issues for review:[3]

A. Whether the trial court's redaction of street addresses and telephone numbers from juror qualification forms (1) constituted a substantial violation of HRS § 612–17 entitling Villeza to relief under HRS § 612–23 (1993), or (2) denied Villeza equal protection of the law?

B. Whether the sentencing judge lacked authority to sentence Villeza?

C. Whether the trial court abused its discretion by continuing Villeza's sentencing?

D. Whether the trial court erred by sentencing Villeza to an extended term of imprisonment?

3. Villeza also asserts on appeal that his due process rights were violated when (a) the circuit court clerk refused to accept Villeza's *quo warranto* petition for filing; and (b) the sentencing judge proceeded with sentencing notwithstanding the pending *quo warranto* proceeding. Because we hold that Judge Heely did not vacate the office of judge and that he had authority to sentence Villeza, these *quo warranto* petition issues are inconsequential and not addressed in this opinion.

4. **HRS § 612–4 Grounds for disqualification.** A prospective juror is disqualified to serve as a juror if the prospective juror:
 (1) Is not a citizen of the United States and of the State, eighteen years old, and a resident of the circuit;
 (2) Is unable to read, speak, and understand the English language;
 (3) Is incapable, by reason of the prospective juror's physical or mental disability, of rendering satisfactory jury service; but a person claiming this disqualification may be required to submit a physician's certificate as to the disability, and the certifying physician is subject to inquiry by the court at its discretion; or
 (4) Has been convicted of a felony in a state or federal court and not pardoned.

 **HRS § 612–5 Disqualification by interest.** No person shall sit as a juror in any case in which

## III. *DISCUSSION*

### A. *Partial Redaction of Juror Qualification Forms*

Villeza argues the trial court was required by HRS § 612–23 to quash the indictment due to the partial redaction of the juror qualification forms. Villeza also argues that the practice of redacting juror qualification forms in criminal cases, but not in civil cases, denied him equal protection of the law. We disagree with each contention.

### 1. **The partial redaction of the juror qualification forms did not amount to a substantial failure to comply with HRS Chapter 612.**

HRS Chapter 612 (1993) prescribes procedures for selecting and impaneling grand juries and trial juries. HRS § 612–13(a) requires each prospective juror to fill out a juror qualification form that "shall elicit the name, address of resident, age of the prospective juror, other information pertinent to disqualification[4] or exemption[5] from jury

the person's relative by affinity or by consanguinity within the third degree is interested, either as a plaintiff or defendant, or in the issue of which the juror has, either directly or through such relative, any pecuniary interest.

5. **HRS § 612–6 Exempt when.** (a) No person shall be authorized to claim an exemption from service as a juror in the courts of the first circuit from January 1, 1989, through December 31, 1990, and in the courts of all circuits, other than the first circuit from January 1, 1990, through December 31, 1991.

 (b) From January 1, 1991, for the courts of the first circuit, and from January 1, 1992, for all other circuits of the State, a person may claim exemption from service as a juror if the person is:
 (1) An attorney at law;
 (2) A head of an executive department, an elected official, or a judge, of the United States, State or county;
 (3) A minister or priest following the minister's or priest's profession;
 (4) A practicing physician or dentist;
 (5) A member of the armed forces or militia when on active service, or an active member of a police or fire department;
 (6) A person who has served as a juror, either in a court of this State or the United States District Court for the District of Ha-

service, and such other matters as may be ordered by the court." HRS § 612-13(a). When a trial jury is to be empaneled, the juror qualification forms are forwarded to the trial judge and, "[u]pon receipt by the judge of the envelopes containing the juror qualification forms, they shall be made available to the litigants concerned." HRS § 612-17(c).[6]

HRS § 612-23 provides litigants with the exclusive statutory method of challenging the selection of grand or trial juries for non-compliance with the requirements of HRS Chapter 612. That section provides in pertinent part:

**Challenging compliance with selection procedures.**

(a) Promptly after the moving party discovered or by the exercise of diligence could have discovered the grounds therefore, and in any event before the trial jury is sworn to try the case, a party may move to stay the proceedings, and in a criminal case to quash the indictment, or for other appropriate relief, on the ground of substantial failure to comply with this chapter in selecting the grand or trial jury.

(b) Upon motion filed under subsection (a) containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with this chapter, the moving party is entitled to present in support of the motion the testimony of the clerk, any relevant records and papers not public or otherwise available used by the clerk, and any other relevant evidence. *If the court determines that in selecting either a grand jury or a trial jury there has been a substantial failure to comply with*

*this chapter and the moving party has been prejudiced thereby, the court shall stay the proceedings pending the selection of the jury in conformity with this chapter, quash an indictment, or grant other appropriate relief.*

(c) The procedures prescribed in this section are the exclusive means by which a person accused of a crime, the State, or a party in a civil case may challenge a jury on the ground that the jury was not selected in conformity with this chapter.

HRS § 612-23 (emphasis added). Thus, to obtain relief under HRS § 612-23, "[t]he moving party must show a *substantial* failure to comply with the law and that [the party] has been prejudiced thereby." Stand. Comm. Rep. No. 542 on H.B. No. 990, in 1973 House Journal at 997 (emphasis added).[7]

Villeza argues that HRS § 612-17(c) entitled him to review "the contents" of the juror qualification forms and that the trial court's redacted version of the forms amounted to a "failure to comply" with the statute. Villeza argues the street addresses and telephone numbers of the prospective jurors constituted "relevant information" and thus, he argues by implication, the failure to comply with HRS § 612-17(c) was substantial, entitling him to relief under HRS § 612-23.

■ We determine substantial compliance with a statute by determining whether the statute has been followed sufficiently such that the intent for which it was adopted is carried out. *See, e.g., City of Lenexa v. City of Olathe*, 233 Kan. 159, 660 P.2d 1368, 1373 (1983); *In re Santore*, 28 Wash.App. 319, 623 P.2d 702, 707-708 (1981). The legis-

---

waii, within one year preceding the time of filling out the juror qualification form.

6. HRS § 612-17 applies to impanelment of trial juries in the first circuit. HRS § 612-18(c) applies to impanelment of trial juries in all other circuits. HRS § 612-18(c) is similar to HRS § 612-17(c) and provides that "the names of prospective jurors to be summoned to sit as a jury, and the contents of juror qualification forms completed by those jurors, shall be made available to the litigants concerned." HRS § 612-18(c).

7. Villeza argues that HRS § 612-23 mandated the quashing of the indictment when he was not

provided with all of the information contained on the juror qualification forms. However, even if we were to assume *arguendo* that failure to provide the street address and telephone numbers of each prospective juror constituted a substantial violation of HRS § 612-17 and that Villeza was prejudiced thereby, quashing the indictment would not be an appropriate form of relief for violating the procedures for selecting a trial jury. Irregularities in the selection of the trial jury have no impact on the validity of an indictment returned by a separate panel of grand jurors. Thus, as the trial court correctly concluded, quashing an indictment is not an appropriate form of relief for non-compliance with procedures for selecting a trial jury.

lature did not state its purpose for requiring juror qualification forms to be made available to litigants under § HRS 612–17(c). *Cf. State v. Samonte,* 83 Hawai'i 507, 518, 928 P.2d 1, 12 (1996) (discussing HRS § 612–18(c)). The obvious purpose, however, is to facilitate the jury selection process and *voir dire* by giving the parties access to general information regarding prospective jurors. The statute also protects a criminal defendant's constitutional guarantees of a presumption of innocence and an impartial jury. *Cf. Samonte,* 83 Hawai'i at 518–19, 928 P.2d at 12–13 (stating the purpose of HRS § 612–18(c), the counterpart of HRS § 612–17(c), applicable to the second, third, and fifth judicial circuits, is to protect constitutional guarantees of a presumption of innocence and an impartial jury).

We take judicial notice that the juror qualification forms used by the First Circuit Court at the time of Villeza's second trial contained, *inter alia,* the following information regarding each potential juror: birth date, years of residence in the state and on the island of Oahu, occupation and employer, employer's phone number, residence phone number, educational background, marital status, number of children, spouse's name and employer, residence address, and other information regarding exemption or disqualification from jury service.[8]

The only items that were not made available to Villeza were home street addresses and home and work telephone numbers. All other information on the forms was provided to Villeza. The clearly discernable purpose of requiring potential jurors to verify their home street addresses and to list their telephone numbers on the form is to enable appropriate court personnel to communicate with them. Direct and personal pretrial communication by a litigant with prospective jurors, however, is neither a purpose of the statute nor permissible. *See, e.g.,* HRS § 710–1075 (1993) (jury tampering is a class C felony); *see also State v. Miyahira,* 6 Haw.App. 320, 324, 721 P.2d 718, 721 (1986) (unauthorized and improper contact with non-jurors taints impartial jury), *overruled in part on other grounds, State v. Pinero,* 70 Haw. 509, 525 n. 9, 778 P.2d 704, 715 n. 9 (1989); and Rule 3.5 of the Hawai'i Rules of Professional Conduct (prohibiting counsel, *inter alia,* from contacts with jurors before and during trial). The prospective jurors' streets addresses and phone numbers were unnecessary to any appropriate pretrial investigation.

■ Based on the foregoing, we hold that the trial court's partial redaction of the juror qualification forms did not violate HRS § 612–17 and there was no substantial failure to comply with HRS § 612–17(c). *Cf. State v. Maelega,* 80 Hawai'i 172, 176 n. 4, 907 P.2d 758, 762 n. 4 (1995) (summarily dismissing a claim the circuit court erred by denying a motion to quash an indictment due to redaction of juror qualification forms). We note the trial court's redaction indicates that it construed the word "shall" in HRS § 612–17(c) as "directory" rather than "mandatory." We hold that such construction was correct because this was not an "anonymous jury" situation, and the mere redaction of street addresses and telephone numbers did not lose, destroy, or sacrifice Villeza's constitutional right to a presumption of innocence and an impartial jury. *See Samonte,* 83 Hawai'i at 523, 928 P.2d at 17.[9] The propriety

---

8. The juror qualification questionnaire specifically asked the following questions:

 a. Are you a U.S. citizen?

 b. Have you ever been convicted of a crime punishable by imprisonment for more than one year and not pardoned by the governor? If yes, what year?

 c. Do you claim to be disqualified or exempt from jury service? If yes, please indicate the disqualification or exemption you are claiming.

 d. Are there other reasons why you should not serve as a juror? Please specify.

 e. Have you ever served as a juror? If yes, what year? Which court?

 f. Have you or any member of your immediate family been a party to a law suit?

 g. Has a claim for personal injury ever been made against you or have you ever made a claim for personal injury?

 h. Are you related to or close friends with any law enforcement officer?

 i. The prospective juror is unable to fill out this form because _____.

9. In *Samonte,* this court was called upon to review a trial court's redaction of the first names, social security numbers, street addresses and phone numbers of prospective jurors and their spouses, and the names and phone numbers of

of a "directory" interpretation of HRS § 612–17(c) is also bolstered by the fact that HRS § 612–23 does not require absolute compliance with Chapter 612 in the jury selection process. Instead, HRS § 612–23 requires a defendant to prove a substantial non-compliance, which Villeza has failed to do.

## 2. The practice of providing criminal litigants with redacted copies of juror qualification forms did not deny Villeza equal protection of the law.

Villeza argues that the trial court's redaction of street addresses and telephone numbers from the juror qualification forms denied him equal protection of the law because litigants in civil jury trials in the first circuit receive unredacted copies of such forms. We disagree.

■ "The essence of the equal protection guarantee embodied in the federal and state constitutions is that 'all persons similarly circumstanced shall be treated alike.' "

their employers from juror qualification forms despite the fact that HRS § 612–18(c) provides that the "names of prospective jurors to be summoned to sit as a jury, and the contents of juror qualification forms completed by those jurors, *shall* be made available to the litigants concerned." *Samonte,* 83 Hawai'i at 523, 928 P.2d at 17 (emphasis in original).

This court viewed the redaction in that case as creating a "partially anonymous jury" and noted that "[a]n anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence." *Id.* at 518–19, 928 P.2d at 12–13 (citing *United States v. Ross,* 33 F.3d 1507, 1519 (11th Cir.1994), *cert. denied,* 515 U.S. 1132, 115 S.Ct. 2558, 132 L.Ed.2d 812 (1995)). An anonymous jury may also infringe on a defendant's right to an impartial jury. *Id.*

In its analysis, this Court focused on whether HRS § 612–18(c) was "directory" or "mandatory" and stated that such classification hinged on whether the trial court's construction of the statute as directory would lose, destroy or sacrifice a criminal defendant's constitutional right to a presumption of innocence and an impartial jury. *Id.* In deciding whether to empanel an anonymous jury, a trial court must balance the need for jury protection and judicial integrity with the need to minimize any prejudicial effects on the defendant to ensure that his fundamental rights are protected. *Id.* at 520, 928 P.2d at 14 (quoting *United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991)).

*Mahiai v. Suwa,* 69 Haw. 349, 360, 742 P.2d 359, 368 (1987) (quoting *Shibuya v. Architects Hawaii, Ltd.,* 65 Haw. 26, 35, 647 P.2d 276, 283 (1982) (quoting *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920))). "A law, neutral on its face, but so administered as to unjustly discriminate between persons in similar circumstances, may deny equal protection." *Mahiai,* 69 Haw. at 360, 742 P.2d at 368 (citing *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)).

■ To substantiate a claim of discriminatory enforcement of the law, the party raising the claim must satisfy a two-part test. First, the party must demonstrate that the law is administered differently against others similarly situated. Second, the party must establish that its selection was "deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification." *Id.* (quoting *State v. Kailua Auto Wreckers, Inc.,* 62 Haw. 222, 227, 615 P.2d 730, 734–35 (1980)). If a party does not

In holding that the trial court in *Samonte* did not abuse its discretion by redacting the juror qualification forms, this Court noted that there was reason to believe that the prosecution needed the protection of an anonymous jury because there was evidence of interference with potential jurors in Samonte's case. *Id.* at 520, 928 P.2d at 14. Furthermore, the court took reasonable precautions to minimize any prejudicial effects on the defendant by way of jury instruction and ensured the protection of the defendant's fundamental rights by providing the unredacted information on the qualification forms and allowing the defense to inquire in detail about the juror's personal backgrounds, biases, etc. *Id.* at 521–23, 928 P.2d at 15–17.

As stated above, we do not regard the redaction in the instant case as creating an "anonymous jury" situation. Therefore, the *Samonte* analysis is not directly applicable here. However, we hold that no danger to Villeza's right to a presumption of innocence and an impartial jury was created by the redaction of only the street addresses and telephone numbers of potential jurors. This redaction did not "raise the specter" that Villeza was a dangerous person so as to endanger his presumption of innocence. Further, because all other vital information regarding the potential jurors was provided to Villeza, the risk of selecting an impartial jury was kept to a minimum. Thus, even under a *Samonte* analysis, the trial court's redaction would be upheld.

satisfy both parts of the test, the party's equal protection claim fails. *Id.*

According to the evidence in this case, the practice of providing litigants with redacted copies of juror qualification forms extended to all criminal cases in the first circuit. Thus, the redaction procedure was not administered differently against other similarly situated criminal defendants having jury trials in the first circuit.

■ Villeza asserts his equal protection claim by comparing himself with litigants in civil cases. Our law has long recognized that criminal and civil defendants are not similarly situated. Our statutes and rules make important distinctions between criminal and civil cases. For instance, a criminal verdict must be unanimous,[10] but a civil verdict can be less than unanimous.[11] A criminal defendant charged with an offense punishable by life imprisonment is given twelve peremptory challenges,[12] but the civil defendant is given three peremptory challenges.[13] Unlike the defendant in a civil case, the criminal defendant has the constitutional right to counsel and to a speedy trial, and may be subjected to bail or to conditions of pretrial release.[14]

Having failed to satisfy the first part of the equal protection test, Villeza's equal protection claim fails.[15]

### B. *Circuit Court Judge's Authority to Sentence Villeza*

Villeza argues the sentencing judge "unlawfully claimed and did usurp the office of circuit judge" because he "relinquished and vacated the office of judge by operation of law when he commenced to perform the duties of Administrative Director" of the courts. Villeza opines Judge Heely "was no longer a judicial officer within the meaning of Article VI, § 3 of the Hawaii State Constitution" and therefore could not sentence him. Villeza bases his conclusion on article VI, section 3 of the Hawai'i Constitution which prohibits a judge from holding "any other office or position of profit under ... the State" and on the common law rule that a public officer's acceptance of a second, incompatible office automatically vacates the first.[16] We disagree with Villeza's contentions.

### 1. The circuit court judge did not vacate the office of judge.

■ The record before us conclusively establishes that Judge Heely never in fact vacated the office of judge. However, Villeza argues Judge Heely vacated the office of judge by operation of law. As a general rule, an office holder vacates his first office by operation of law when (1) he accepts a second office; and (2) either (a) the holding of the two offices by one person at the same time has been prohibited by law (*e.g.,* constitution), or (b) the two offices are incompatible at common law. *See Pombo v. Fleming,* 32 Haw. 818, 822 (1933); *Hollinger v. Kumalae,* 25 Haw. 669, 689 (1920). The application of

10. Hawai'i Rules of Penal Procedure Rule 31(a).

11. HRS § 635–20 (1993).

12. HRS § 635–30 (1993).

13. HRS § 635–29 (1993).

14. HRS Chapter 804 (1993).

15. In the circuit court, Villeza also contended that the redaction procedure deprived him of due process of law and the right to the effective assistance of counsel. He does not make these arguments on appeal.

16. Villeza also bases his argument on HRS § 601–3 (1993) which prohibits the administrative director from holding any other office. In relevant part, HRS § 601–3 provides:

§ **601–3 Administrative Director.** The chief justice, with the approval of the supreme court, shall appoint an administrative director of the courts to assist the chief justice in directing the administration of the judiciary. The administrative director shall be a resident of the State for a continuous period of three years prior to the administrative director's appointment, and shall be appointed without regard to chapters 76 and 77 and shall serve at the pleasure of the chief justice. The administrative director shall hold no other office or employment. . . .

Because the pivotal issue before the Court is whether Judge Heely had authority, as circuit court judge, to sentence Villeza and no issue is presented challenging any administrative action taken by him while exercising the functions of the office of administrative director or challenging whether he met the qualification requirements for that office, we do not address this statutory argument.

this rule cannot result in a conclusion Judge Heely vacated the office of circuit court judge because: (1) Judge Heely never accepted the office of administrative director or held any position other than that of circuit court judge; (2) Judge Heely's performance of duties associated with the office of administrative director did not violate any legal dual-office holding prohibition; and (3) the duties of circuit court judge and administrative director are not incompatible at common law; and, nevertheless, the common law rule would be inapplicable because Judge Heely was compelled by order of the Hawai'i Supreme Court to perform the duties of administrative director.

Article VI, section 3 of the Hawai'i Constitution provides in relevant part:

> No ... judge shall, during the term of office, engage in the practice of law, or run for or hold any other *office or position of profit* under the United States, the State or its political subdivisions.

Haw. Const. Art. VI, § 3.

Article VI, section 3 prohibits a sitting judge from simultaneously performing the duties of the office of administrative director only if performing such duties constitutes holding another "office or position of profit." *See Kekoa v. Supreme Court*, 55 Haw. 104, 110–111, 516 P.2d 1239, 1244–45 (1973). We hold that it does not.

■ On the record before us it is plain that Judge Heely held no "office or position," for profit or otherwise, within the meaning of article VI, section 3 when he was assigned the duties of administrative director by this court. While the functions of the administrative director's office were assigned to Judge Heely on August 9, 1993 by the Hawai'i Supreme Court,[17] Judge Heely was never appointed to, did not accept and never held the office of the administrative director. As evidence thereof, the record contains an affidavit from Kenneth Nakamatsu, Associate Personnel Director of the Hawai'i State Judiciary, which indicates that during the period in question Judge Heely occupied position number 211E, circuit court judge, while the position of the administrative director, position number 223E, remained vacant. There is no evidence that Judge Heely received the administrative director's compensation. Thus, there is no question that Judge Heely never held an office or position with the Hawai'i State Judiciary other than that of circuit court judge.

■ Villeza argues that even if Judge Heely was never officially appointed to the administrative director's office, he was the *de facto* administrative director by virtue of fulfilling the duties of that office and, therefore, he did hold another office in violation of article VI, section 3. This argument is also without merit because it fails to take into account the fact the Supreme Court assigned the administrative director's duties to Judge Heely. It is settled that there is no violation of a constitutional dual-office holding prohibition when additional duties are assigned to public officers. In such cases, the newly-assigned duties are viewed merely as an addition to existing responsibilities and do not create an additional office or position. *See Bath Club, Inc. v. Dade County*, 394 So.2d 110 (Fla.1981) (requiring that the duties not be incompatible); *Martin v. Smith*, 239 Wis. 314, 1 N.W.2d 163, 170 (1941) ("Where the holder of a position has imposed upon him an *ex officio* post or position, the *ex officio* post is not an office within the meaning of that term as used by constitutional and statutory provisions against holding two offices."); *see also* 63A Am.Jur.2d

---

17. The August 9, 1993 order provides in pertinent part:

> IT IS HEREBY ORDERED, pursuant to the authority granted to the Chief Justice under Article VI, § 6 of the Constitution of the State of Hawaii, that the functions of the Office of the Administrative Director are transferred to the First Division of the First Circuit, HONORABLE DANIEL G. HEELY presiding, until further ordered.
>
> IT IS FINALLY ORDERED that until further direction, all administrative operations that report to the Office of the Administrative Director shall report to the HONORABLE DANIEL G. HEELY, who shall perform administrative functions subject to the authority of the Chief Justice.

*Public Officers and Employees* § 70 (1984) (provision prohibiting dual office holding would not be violated by holding "an office which has been clothed with added powers or burdened with additional duties, even though such powers and duties have been withdrawn from another office").

Thus, because Judge Heely held only his position as circuit court judge and held no office or position, for profit or otherwise, there was no violation of article VI, section 3 of the Hawai'i Constitution.

We next examine whether the duties of the offices of circuit court judge and administrative director are incompatible at common law. We hold that they are not. At common law, an office holder who accepts a second office incompatible with the first automatically vacates the first office. *E.g. Pombo v. Fleming,* 32 Haw. 818 (1933) (acceptance of office of chairman and executive officer of Maui Board of Supervisors vacated the office of supervisor); *Hollinger v. Kumalae,* 25 Haw. 669, 689 (1920) (acceptances of office of supervisor of the City & County of Honolulu automatically vacated the offices of state senator and state representative); *accord, Township of Belleville v. Fornarotto,* 228 N.J.Super. 412, 549 A.2d 1267 (1988); *Hover v. Wolven,* 175 Ohio St. 114, 191 N.E.2d 723 (1963); *Howard v. Harrington,* 114 Me. 443, 96 A. 769 (1916); *State v. Goff,* 15 R.I. 505, 9 A. 226 (1887). *Cf. In re Pioneer Mill Co., Ltd.,* 53 Haw. 496, 497 P.2d 549 (1972) (judge who announced intention to seek office of governor forfeited his office where state constitution then specifically provided "[a]ny justice or judge who shall become a candidate for an elective office shall thereby forfeit his office").

■ Whether one office is incompatible with another depends on the rights, duties, or obligations connected with or flowing from the offices. *See, e.g., Goldberg v. State,* 69 Md.App. 702, 519 A.2d 779, 788 (1987), *aff'd,* 315 Md. 653, 556 A.2d 267(Md.), *cert. denied,* 493 U.S. 852, 110 S.Ct. 151, 107 L.Ed.2d 109 (1989). If one office is subordinate to the other or the functions of the offices are in-

herently inconsistent and repugnant to each other, the offices are incompatible. *Id.*

■ An office would be incompatible with the office of judge if holding such office created a conflict of interest, a lack of impartiality or an appearance thereof. In other words, the office would be incompatible if it challenged judicial integrity and offended traditional notions of the necessary impartiality of the judiciary. Judicial integrity, however, is not threatened in this case. It is well recognized that various administrative functions are routinely performed by judges in both the district and circuit courts of this state. In fact, the ethical rules binding judges mandate that "a judge shall maintain professional competence in judicial administration and should cooperate with other judges and court officials in the administration of court business." Revised Code of Judicial Conduct (RCJC) Canon 3C(1); *see also* RCJC Canons 3C(1) through (4). Thus, a conclusion that the duties of the two offices are incompatible defies all logic. As such, we hold that the offices of circuit court judge and administrative director are not incompatible at common law.

■ It has been held that the common law rule prohibiting a person from holding incompatible offices is inapplicable when a person is compelled by law to accept the second position because "neither the design nor the spirit of" these prohibitions is served. 63A Am.Jur.2d *Public Officers and Employees* § 83 (1984) (citation omitted). This exception corresponds to the above rule that newly-assigned duties do not create an office for purposes of the constitutional dual-office holding prohibition. Here, with Judge Heely playing a completely passive role, the Chief Justice and the Supreme Court, considering the administrative needs of the judiciary, determined that the functions of the administrative director should be transferred to the First Division of the First Circuit Court, the Honorable Daniel G. Heely presiding, until further ordered. Article VI, section 6 of the Hawai'i Constitution expressly grants to the Chief Justice the exclusive power to administer the courts, and if the Chief Justice determines that administrative duties traditionally

performed by the administrative director should be performed by a judge or judges, temporarily or permanently, such decision is within his power.[18]

 In conclusion, we hold that Judge Heely did not vacate the office of circuit court judge simply because he performed court-ordered administrative duties assigned to the circuit court by the Chief Justice and the supreme court.[19]

C. & D. *Sentencing: Continuing Hearing, Appointment of Third Mental Health Expert, and Extended Term Sentence*

Villeza argues his extended term sentence should be reversed because:

(1) Dr. Wingert's dangerousness evaluation was not a "psychological evaluation" within the meaning of the extended term sentence statute, HRS § 706–662(3), because Dr. Wingert did not interview Villeza face-to-face;

(2) the trial court abused its discretion by continuing the sentencing proceeding to allow the State to obtain Dr. Wingert's dangerousness evaluation after Dr. Reed was unable to render a professional opinion on the issue of Villeza's dangerousness; and

(3) Dr. Wingert's expert testimony should not have been admitted at the extended term sentencing hearing because the testimony failed to meet the requirements for admission of expert tes-

timony under Rule 702 of the Hawai'i Rules of Evidence (HRE).

We disagree with all of these contentions.

1. **The dangerous evaluation required by HRS § 706–662(3) requires an evaluation that documents a significant history of dangerousness and need not include a face-to-face interview of the defendant where the defendant refuses to participate in such interview.**

(a) *The Statute*

Hawai'i's extended term sentence statute, HRS § 706–662, is patterned after the Model Penal Code's (MPC) extended term sentence provision, MPC § 7.03. MPC § 7.03 authorizes a court to sentence a person who has been convicted of a felony to an extended term of imprisonment if the court finds, *inter alia*, that the defendant is "a dangerous, mentally abnormal person" whose commitment for an extended term is necessary for protection of the public:

The Court shall not make such a finding unless the defendant has been subjected to a psychiatric examination resulting in the conclusions that:

(a) his mental condition is gravely abnormal;

(b) his criminal conduct has been characterized by a pattern of repetitive or compulsive behavior or by persistent aggressive behavior with heedless indifference to consequences; and

---

18. The chief justice of the supreme court shall be the administrative head of the courts.... With the approval of the supreme court, the chief justice shall appoint an administrative director to serve at the chief justice's pleasure. Haw. Const. art. VI, § 6.

19. Even if the circuit court judge were deemed to have vacated the office of judge, the act of sentencing would be valid as to Villeza because it is well settled that official acts of a *de facto* officer are valid as far as the rights of third persons and the public are concerned and are not subject to collateral attack. *See, e.g., In re Sherretz*, 40 Haw. 366, 372–381 (1953); *Republic of Hawaii v. Oishi*, 9 Haw. 641, 646 (1895) (a judge *de facto* is a judge *de jure* to all parties except the state); *Hetrich v. County Com'rs of Anne Arundel County*,

222 Md. 304, 159 A.2d 642 (1960) (attempted appointment of county commissioner to office of county business manager was ineffective, but acts taken as business manager under color of authority were valid as to third persons and the general public as acts of a *de facto* officer). There is an exception, however, where a judge is disqualified from holding office because of "basic constitutional protections designed for the benefit of litigants." *In re Pioneer Mill Co., Ltd.*, 53 Haw. 496, 503–504, 497 P.2d 549, 554, (1972) (quoting *Glidden Co. v. Zdanok*, 370 U.S. 530, 535–38, 82 S.Ct. 1459, 1465, 8 L.Ed.2d 671 (1962) (*de facto* doctrine inapplicable where a judge is disqualified from holding office because he became a candidate for public office)).

(c) such condition makes him a serious danger to others.

MPC § 7.03(3).

Hawai'i's legislature generally adopted the language of MPC § 7.03 when it enacted HRS § 706–662 in 1972. The legislature authorized an extended term sentence for the "dangerous person," but departed from MPC § 7.03 by not requiring the dangerous person to be "mentally abnormal." Thus, HRS § 706–662(3) did not include the MPC language requiring a psychiatric examination concluding that the defendant's mental condition is gravely abnormal. However, the legislature did adopt the MPC language requiring a "psychiatric examination." As originally enacted, HRS § 706–662(3) provided for extended term sentencing of a dangerous person as follows:

> **Dangerous person.** The defendant is a dangerous person whose commitment for an extended term is necessary for protection of the public. The court shall not make such a finding unless the defendant has been subjected to a *psychiatric examination resulting in the conclusion* that his criminal conduct has been characterized by compulsive, aggressive behavior with heedless indifference to consequences, and that such condition makes him a serious danger to others.

In 1988, the legislature amended HRS § 706–662(3). First, it deleted the language requiring that the defendant be subjected to "a psychiatric examination," instead requiring that the defendant be subject to "a psychiatric or psychological evaluation." Furthermore, instead of an examination resulting in the conclusion of compulsive, aggressive criminal conduct, the amended statute requires an evaluation that "documents a significant history of dangerousness to others resulting in criminally violent conduct." The amended statute also authorizes "the introduction of victim-related data in order to establish dangerousness."

The relevant version of HRS § 706–662(3), as amended in 1988, provided for extended term sentencing of the dangerous person as follows:

> The defendant is a dangerous person whose imprisonment for an extended term is necessary for the protection of the public. The court shall not make such a finding unless *the defendant has been subjected to a psychiatric or psychological evaluation which documents a significant history of dangerousness to others resulting in criminally violent conduct,* and that such history makes the defendant a serious danger to others. Nothing in this section precludes the introduction of victim related data in order to establish dangerousness in accord with Hawaii Rules of Evidence.

HRS § 706–662(3) (Supp.1992) (emphasis added).

### (b) *Dangerousness Evaluation*

Villeza argues that the requirements of HRS § 706–662(3) were not met in this case as Dr. Wingert testified that he did not conduct what he considered, in "professional terminology," a psychological evaluation of Villeza because he did not interview Villeza face-to-face. The fact that Dr. Wingert stated he did not conduct what he considered to be a professional psychological evaluation does not mean a psychological evaluation was not conducted within the meaning of HRS § 706–662(3). It is the statutory meaning, not the "professional" meaning, that concerns this Court.

The determinative issue is whether the psychiatric or psychological *"evaluation"* required by HRS § 706–662(3) must include a face-to-face interview of the defendant.

"The construction of a statute is a question of law which [the appellate court] reviews *de novo.*" *State v. Aluli,* 78 Hawai'i 317, 320, 893 P.2d 168, 171 (1995) (quoting *Ross v. Stouffer Hotel Co. (Hawai'i) Ltd.,* 76 Hawai'i 454, 460, 879 P.2d 1037, 1043 (1994)). When construing a statute, the appellate court's obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute. *Aluli,* 78 Hawai'i at 320, 893 P.2d at 171; *Pacific Int'l Services Corp. v. Hurip,* 76 Hawai'i 209, 216, 873 P.2d 88, 95 (1994). Where the language is plain and unambiguous, the court's sole duty is to give effect to its plain and obvious

meaning. *Aluli,* 78 Hawai'i at 320, 893 P.2d at 171; *Ross,* 76 Hawai'i at 461, 879 P.2d at 1044. Departure from the literal construction of a statute is justified only when such construction would produce an absurd and unjust result and the literal construction is clearly inconsistent with the purposes and policies of the statute. *Id.; Richardson v. City and County of Honolulu,* 76 Hawai'i 46, 60, 868 P.2d 1193, 1207 (1994).

■ In this case, the language of HRS § 706–662(3) provided for a psychiatric or psychological "evaluation" that "documents" a history of dangerousness and does not require a psychiatric or psychological examination of the defendant. This construction gives effect to the legislature's intent, as evidenced by the 1988 amendment requiring an "evaluation" documenting a history of dangerousness, instead of an "examination" resulting in the conclusion of compulsive, aggressive criminal conduct. This construction is also consistent with the fact that HRS § 706–662(3), unlike MPC § 7.03, does not require that the defendant be diagnosed as a "mentally abnormal" dangerous person. Accordingly, we hold that a psychiatric or psychological evaluation of a defendant under HRS § 706–662(3) does not require a face-to-face interview in cases where the defendant refuses to be examined.

■ Moreover, "laws *in pari materia,* or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another." HRS § 1–16; *Richardson,* 76 Hawai'i at 55, 868 P.2d at 1202 (internal brackets omitted). "[W]here a statute with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed." *State v. Rodgers,* 68 Haw. 438, 442, 718 P.2d 275, 277 (1986) (elipses and citations omitted).

Section 603 of HRS Chapter 706 authorizes pre-sentence mental or medical examinations of convicted defendants to provide the sentencing court with psychiatric or medical information not usually found within the scope of the pre-sentence investigation and report. The statute provides that "the court may order a defendant who has been convicted of a felony or misdemeanor to submit to mental or other medical observation and *examination* . . . as the court determines necessary to be for the purpose [of imposing sentence]." HRS § 706–603 (emphasis added). It also provides for the appointment of psychiatrists, psychologists, and physicians, who are required to submit reports of their examination to the sentencing court.

■ Thus, HRS §§ 706–603 and 706–662(3) each authorize the preparation of reports containing psychiatric or psychological information to assist the sentencing court in imposing sentence on a defendant. However, while HRS § 706–603 requires the defendant to submit to a "mental examination," HRS § 706–662(3) does not. The omission of such a provision from HRS § 706–662(3) suggests a different legislative intent exists and that the defendant's submission to a psychiatric or psychological examination is not a requirement of HRS § 706–662(3).

■ Finally, the language of HRS § 706–662(3) provides that the defendant be "subjected to" the psychiatric or psychological evaluation. Villeza argues that such language requires a face-to-face interview of the defendant. A more logical interpretation of the phrase "subject to" in HRS § 706–662(3), however, is that it merely requires that the defendant be the subject of such an evaluation and not that the defendant actively participate therein. By enacting HRS § 706–662(3), the legislature determined that extended term sentences are warranted for convicted felons who are a serious danger to others. If the statute were construed to require the defendant to participate in a face-to-face interview, convicted felons like Villeza, who may be deemed "dangerous persons" within the meaning of HRS § 706–662(3), could easily escape the imposition of extended term sentences by simply refusing to respond to questions from a mental health expert at the penalty phase of the proceed-

ings, as Villeza did here.[20] Such a result would clearly be inconsistent with the purpose and policy of HRS § 706–662(3).

In sum, we hold that Dr. Wingert's psychological evaluation documented Villeza's significant history of dangerousness to others resulting in criminally violent conduct, and such evaluation, without a face-to-face interview with Villeza, was sufficient to support the trial court's extended term sentence.

### 2. Continuation of the sentencing proceeding to obtain Dr. Wingert's dangerousness evaluation was not an abuse of discretion because the three-month delay in sentencing was not substantially detrimental to Villeza.

Villeza argues that the trial court improperly continued his sentencing proceeding to allow the State to obtain Dr. Wingert's dangerousness evaluation after Dr. Reed was unable to render a professional opinion on the issue of Villeza's dangerousness. Villeza argues that he "should have been sentenced as scheduled, on August 27, 1993, when the evidence was clear that the threshold for extended term sentencing had not been reached as to serious dangerousness." Villeza argues that the continuation of the sentencing proceeding violated Rule 32(a) of the Hawai'i Rules of Penal Procedure, which provides that "sentence shall be imposed without unreasonable delay."

■■■ The continuation of the sentencing proceeding is reviewed by the appellate court for an abuse of discretion. *State v. Gager,* 45 Haw. 478, 488, 370 P.2d 739, 745 (1962); *State v. Faulkner,* 1 Haw.App. 9, 10, 612 P.2d 121, 122 (1980). The trial court abuses its discretion if it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. *State v. Akina,* 73 Haw. 75, 78, 828 P.2d 269, 271 (1992); *State v. Sacoco,* 45 Haw. 288, 292, 367 P.2d 11, 13 (1961).

■■■ The trial court in this case granted the State's motion for a dangerousness as-

sessment in connection with its request for extended term sentencing. The first mental health examiner withdrew because of a conflict of interest. The second examiner, Dr. Reed, could not make a determination of Villeza's dangerousness. The trial court continued Villeza's sentencing proceeding at the State's request in order to allow the State to obtain a mental health examiner's dangerousness evaluation. The State was entitled to that evaluation. Dr. Reed did not determine that Villeza was *not* dangerous; rather, he could make no such determination. A reasonable continuance under these circumstances clearly was not an abuse of discretion. Furthermore, the three-month delay in sentencing did not cause Villeza substantial detriment as all pre-sentence confinement time was credited towards Villeza's sentence.

### 3. The trial court did not abuse its discretion by admitting Dr. Wingert's testimony.

Villeza argues that Dr. Wingert's testimony at the extended term sentence hearing should have been stricken because it did not meet the requirements of *State v. Montalbo,* 73 Haw. 130, 828 P.2d 1274 (1992), for the admission of expert testimony under HRE 702.

■■■ The record establishes that all of the items that provided a basis for Dr. Wingert's opinion (*e.g.,* records, interviews, etc.) were reasonably relied upon by experts in the field of clinical psychology to form an opinion as to serious dangerousness. As such, Dr. Wingert's testimony met the requirements of HRE 702 and 703 and, therefore, the trial court did not abuse its discretion by admitting his testimony.

### 4. The extended term sentence conformed with the requirements of HRS § 706–662(3).

■■■ A hearing to determine whether an extended term should be imposed pursuant to HRS § 706–662 "cannot be equated 'with the routine sentence of a trial judge

---

20. *See Estelle v. Smith,* 451 U.S. 454, 468, 101 S.Ct. 1866, 1875–76, 68 L.Ed.2d 359 (1981) ("A criminal defendant, who neither initiates a psy ("A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce

any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him [at his] sentencing proceeding.'").

who is vested with wide discretion in the sources and types of evidence which may be utilized by him in the proper disposition of convicted offenders.'" *State v. Morishige*, 65 Haw. 354, 366–67, 652 P.2d 1119, 1128 (1982) (quoting *State v. Kamae*, 56 Haw. 32, 38, 526 P.2d 1200, 1204 (1974)). "Each of the subsections of HRS § 706–662 requires the trial court to engage in a two-step process to impose a sentence for an extended term. The first step involves a finding by the court that the defendant is within the class of offenders to which the particular subsection applies." *Morishige*, 65 Haw. at 367, 652 P.2d at 1128; *State v. Huelsman*, 60 Haw. 71, 76, 588 P.2d 394, 398 (1978). If the court so finds, it must then decide whether the defendant's commitment for an extended term is necessary for the public's protection, or in the case of the multiple offender, whether the defendant's criminality is so extensive that an extended term is warranted. *Morishige*, 65 Haw. at 367, 652 P.2d at 1129.

■ The establishment of the defendant's status as a persistent, professional, dangerous, or multiple offender, or offender against an elderly, handicapped or minor person at the initial step "involves 'historical facts', the proof of which exposes the defendant to punishment by an extended term sentence, similarly to the manner in which the proof of his guilt exposes him to ordinary sentencing." *Id.* (quoting *Huelsman*, 60 Haw. at 79, 588 P.2d at 400). Hence, "these facts must be established by proof beyond a reasonable doubt in a hearing where the ordinary rules of evidence apply." *Morishige*, 65 Haw. at 367, 652 P.2d at 1129; *Kamae*, 56 Haw. at 635–38, 548 P.2d at 637–38.

■ The evidence at Villeza's extended term hearing consisted of the testimonies of Dr. Wingert, neighbors Jarvis and Matthew Claussen, Officer Rivera and Villeza's brother Ian. All witnesses were competent to testify and the foundations for their testimonies were properly established. The testimonies of these witnesses established a long history of threatening, violent, and assaultive behavior by Villeza against his family members and his neighbors. The testimonies provided proof beyond a reasonable doubt that Villeza had a significant history of dangerousness resulting in criminally violent conduct. Based upon the testimony, the trial court found that (1) Villeza was a serious danger to others and within the class of dangerous persons enumerated in HRS § 706–662(3); and (2) Villeza's commitment for an extended term of imprisonment was necessary for the protection of the public.

The historical facts necessary to impose extended term sentencing were established beyond a reasonable doubt by the evidence. Thus, we discern no error in the imposition of an extended term sentence.

## IV. *CONCLUSION*

Based on the foregoing, we affirm the judgment of the circuit court.

Affirmed.